**Robert E. BOEHME, No. 126109, Petitioner,**

v.

**Roger MAXWELL, Superintendent of the Washington State Reformatory at Monroe, Washington, Respondent.**

**Civ. No. 7836.**

United States District Court, W. D. Washington, N. D.

Oct. 3, 1968.

Frank August Peters, Tacoma, Wash., for petitioner.

Slade Gorton, Atty. Gen., State of Wash., for respondent.

## MEMORANDUM OPINION AND ORDER DENYING PETITION

WILLIAM N. GOODWIN, District Judge.

Counsel for Robert Boehme filed a petition for a writ of habeas corpus. Immediately thereafter, he requested that this Court enter an order directing the taking of the deposition of one Orindorff. He claimed that Orindorff's deposition was essential to establish a contention that a grievous error had been committed by the trial court which entitled his client Boehme to a new trial. He presented his request for the order as an emergency matter, claiming that he had located Orindorff in the City of Baltimore, Maryland, and that Orindorff's whereabouts had been previously unknown. This Court refused to enter the order without first ascertaining whether or not an evidentiary hearing should be held to determine the validity of the contentions of Boehme set forth in his petition.

The nature of the contentions required a review of the entire record, and the Court undertook to read and reread the transcript of all the proceedings that occurred before, during, and after the trial of the case.

The petitioner Boehme was convicted of an attempt to poison his wife. Robert Boehme and Mary Boehme had been married approximately two and one-half years at trial time. He was a medical doctor practicing his profession in Port Orchard, Washington. Mary had been a

registered nurse and had been previously married to Robert's brother. Robert had been previously married but the record does not disclose how many times.

Robert and Mary were working in a boathouse and Mary suffered an injury as a result of a board or beam striking her either on the neck or on the head. The record does not disclose just how or why this injury occurred. It appeared during the course of the testimony at the trial that Robert injected her in the hip immediately after the injury. He claimed it was morphine and that he intended to ease the pain and prevent her suffering. Thereafter, she was admitted to a hospital in Bremerton, Washington and a Dr. Strehlow came to minister to her. He diagnosed a severe head injury and recommended that a neurologist and neurosurgeon be called. He telephoned Dr. Stanley Durkin of Tacoma who agreed to see her at St. Joseph's Hospital in Tacoma. Dr. Durkin met Mary when the entourage arrived from Bremerton and was in charge of her case from the time of her arrival at St. Joseph's Hospital until her discharge.

While she was confined at St. Joseph's Hospital, Robert visited her and "surrepticiously" again injected her in the hip. He claimed that the substance was Ritalin. In the early period of Mary's hospitalization, she was fed intravenously. The history of Mary's hospitalization, her symptoms, and the diagnosis did not square with the head injury. Dr. Durkin, a neurosurgeon and neurologist, Dr. Pratt, the attending anesthesiologist, and two or more other medical doctors and/or toxicologists expressed the opinion that she had been poisoned. Samples of Mary's blood and urine were taken during the early period of her hospitalization and were preserved by a pathologist named Dr. Charles P. Larson. These samples were forwarded to a Dr. Richard Petty, the Assistant Medical Examiner for the State of Maryland, who practices his profession in Baltimore. Petty was the employer of Orindorff.

It was claimed that Robert Boehme had not one but two motives. He was involved in a meretricious relationship with one Wanda Ostby, a former patient, and he had insured his wife of two and one-half years so that he stood to gain in the neighborhood of $170,000 if she died by accidental means. $150,000 of the insurance was a term policy.

Mrs. Ostby testified that she and Dr. Robert Boehme had associated intimately for a period of time, including meetings in the State of California that were not doctor and patient oriented. Boehme, in his defense, admitted the existence of the insurance but on his direct examination denied that he was more than a friend of Mrs. Ostby. Ostby testified to two material matters, the meretricious relationship and the statement by Boehme that "he would take care of Mary." This he also denied.

It would appear that his denial of his relationship with Ostby was untenable but he did not know that Ostby had not followed his directions to destroy all written communications. He did not follow the adage, "Do right and fear no man—don't write and fear no woman." Certain writings had reached the hands of the prosecuting authorities that caused the petitioner to reverse the contention he made on his direct examination and to flatly admit that he had not been truthful.

To bolster the opinions of the several physicians who testified that Mary had been poisoned, the state called a Dr. Freimuth (PhD), who is a toxicologist in the office of the Chief Medical Examiner for the State of Maryland. He had performed certain tests on the urine samples and from these tests concluded that the urine contained promazine. It also developed that the bottle from which Mary Boehme received her intravenous feeding contained promazine. It was the state's contention that the promazine was combined with a poison which had a deleterious effect on the nervous system. In an effort to establish the nature of the toxic material that was in the body of Mary Boehme, Dr. Charles

Petty performed certain tests on blood samples which were prepared and forwarded to him by doctors who attended Mary Boehme and by Dr. Larson, the pathologist. Dr. Petty maintained a laboratory at 700 Fleet Street in Baltimore, Maryland. He also had a contract with the United States Army Chemical Center to do certain testing procedures and used a laboratory located in the community of Edgewood in the Baltimore area. This laboratory contained what is known as a titration machine. It is a machine used to measure cholinesterase. Orindorff, a technician in Dr. Petty's laboratory who had a bachelor's degree in chemistry, had completed certain subjects for his master's degree, and was then working on a doctorate, was delegated certain duties in connection with the testing procedures employed by Dr. Petty in his efforts to determine what, if any, poison could be demonstrated by his procedures to be present in the blood of Mary Boehme. Dr. Petty prepared certain samples or had them prepared in his laboratory at 700 Fleet Street. He directed Orindorff to take these samples, which included "control samples" (samples prepared from the blood of an individual who showed no symptoms of poisoning), and go to the Edgewood laboratory and to run the samples through the titration machine, obtain the readings and return with them to his laboratory on Fleet Street. The record discloses that the titration machine, although owned by the United States Army, had been previously used for cholinesterase tests by Dr. Petty and his staff. It is an automatic machine. Orindorff did as directed and returned with the readings where he and Petty discussed the tests. From these readings and other factors, Dr. Petty concluded that Mary Boehme had been poisoned with a toxic substance of the "carbamate class."

■ In paragraph 9(a), petitioner contends that his constitutional rights were violated because he was unable to confront Orindorff face to face, and that Petty was permitted to give hearsay testimony that was prejudicial and in viola-

tion of his constitutional rights, and that this trial-court error entitled him to a new trial. In light of the entire record, disclosing that Orindorff, who was under Petty's supervision, was a technician whose competence was not questioned and whose trip to Edgewood involved the use of an automatic machine to test samples prepared under Petty's direction and supervision, it was not error for the trial court to permit Petty to testify and to give his opinion which was in part based on the readings obtained by Orindorff.

There is nothing in the record to show that more was required to reach the proper results in the titration procedure than merely putting the samples into the machine and reading the results off the machine. There can be little doubt that Orindorff was capable of correctly completing the required processes in the present test.

In Fitts v. United States, 328 F.2d 844 (10th Cir. 1964), cert. den., 379 U.S. 851, 85 S.Ct. 96, 13 L.Ed.2d 55, the court was concerned with the testimony of a doctor, the Chief Psychiatrist at the Springfield Medical Center. He had testified that the defendant Fitts was sane and able to stand trial. His opinion was based in large part on his conferences with the staff of the Medical Center and the results of tests performed on Fitts by that staff. Fitts contended that such testimony was "hearsay or irrelevant." The court stated:

"As Dr. Oppegard explained to the trial court it was his function as Chief Psychiatrist * * * to correlate the findings of the doctors and other personnel at the Medical Center which were a result of their examinations and observations of the appellant. Dr. Oppegard's testimony based on these reports and upon his conferences with the doctors and with the appellant cannot be said to be within the hearsay rule, but rather a part of the case history upon which he based his opinion." 328 F.2d at 847.

In Birdsell v. United States, 346 F.2d 775 (5th Cir. 1965), cert. den., 382 U.S.

963, 86 S.Ct. 449, 15 L.Ed.2d 366, reh. den., 383 U.S. 923, 86 S.Ct. 900, 15 L. Ed.2d 680, motion den., 384 U.S. 914, 86 S.Ct. 1347, 16 L.Ed.2d 368, the court was presented with a problem similar to that in *Fitts, supra.* The court held that:

" * * * [T]he records of a hospital performing psychiatric investigations with respect to the symptoms recounted by the subject or the results of recognized psychological tests * * * [while they] may be useless to a jury and be excludable on that ground, there is abundant authority that an expert witness who is available for cross-examination at the trial may use such records as the basis for an opinion without the proponent having to call every person who made a recorded observation." 346 F.2d at 779.

The petitioner in this cause can hardly contend that the observations and recordings of readings on an automatic testing machine are less reliable than the recorded opinions of a staff member of a psychological center concerning his conclusions from personal observations of a patient.

The record shows that Orindorff's observations concerning the "control" sample were correct and that the control sample showed a normal result. From those facts, and the undisputed ability of Orindorff to read, it can be concluded that he was qualified to record the results of the titration machine. A statement of the Fifth Circuit in *Birdsell, supra,* correctly states the applicable logic:

"With the increased division of labor in modern medicine [and modern medical testing] the physician making a diagnosis must necessarily rely on many observations and tests performed by others and recorded by them; records sufficient for diagnosis in the hospital ought be enough for opinion testimony in the courtroom." 346 F.2d at 779–780.

See also, Brown v. United States, 126 U.S.App.D.C. 134, 375 F.2d 310 (1967), cert. den., 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359.

■ In paragraph 9(b), petitioner contends that his constitutional rights were violated when Mary Boehme's attending physicians were ordered to testify by the trial court. Such action was necessary because a previous restraining order had been entered by another judge prohibiting them from disclosing any of their findings made at the time that they attended Mary, and, further, defense counsel threatened a civil action for damages if they did disclose without her consent. It is petitioner's contention that communications between doctor and patient are privileged, and absent Mary's consent, her attending physicians cannot testify to facts concerning the cause of her illness or what they observed, i. e. the puncture wounds in her hip subsequently admitted to have been caused by the injections. The trial court concluded that the patient-physician privilege was not applicable and that these were not confidential disclosures of a character which precluded the physician from relating his findings when the disclosures pertained to the claim that her husband had committed an assault upon her person. The Supreme Court of the State of Washington enlarged upon this in its opinion and affirmed the trial court's ruling in this regard. State v. Boehme, 71 Wash.2d 621, 634–637, 430 P.2d 527 (1967). This Court adopts the Supreme Court's opinion concerning this claim of the petitioner.

■ In paragraph 9(c), petitioner deals with the evidence concerning a bottle of intravenous fluid. At the time Mary Boehme was first hospitalized at St. Joseph's Hospital, Dr. Durkin prescribed intravenous feeding. A tube running from a bottle containing the glucose solution to a needle injected in the patient's vein was later determined to have been administering promazine into the patient's body. Testimony disclosed that this bottle contained promazine which was foreign to the glucose solution, and the only way that its pres-

ence could be accounted for was by its introduction into the bottle without the knowledge of the attending nurses or the attending physician. Further testimony established that promazine would activate or increase the toxic effect of any anti-cholinesterase agent injected into the patient's body. Petitioner claims that he was not adequately advised of the intention of the state to establish the presence of promazine in the patient's body or promazine in the bottle that was being used to intravenously feed the patient because of the failure of the state to allege that poison was injected into the patient's body in any area save and except the hip.

The trial court permitted an oral amendment so that the information would conform to the proof.

This was well within the Court's discretion, and, further, in this Court's opinion, it was unnecessary. The information supplied the defendant showed the claim that the toxic substance was injected in the hip, and throughout the course of the trial, it was merely shown that promazine was present and what effect it would have, although witnesses did testify that an overdose of promazine might have a toxic effect.

█ In paragraph 9(d), petitioner alleged that the members of the jury eventually selected must have been prejudiced by pre-trial publicity and courtroom procedures consisting of an allocation of space in the courtroom by the trial judge for news media employees and the extensive radio, magazine and newspaper coverage, and a further claim that the jury had to pass by a hostile, partisan mob during the course of the trial.

This Court finds that the trial judge permitted defense counsel extreme leniency in his questioning of the jury, and that he indicated his satisfaction with the jurors that were eventually selected and sworn to try the case. In no instance does the record disclose that counsel for the defendant made any contentions of a like or similar character as

he now presents in his petition so that the trial judge could have ruled. In fact, after the jury was selected and sworn to try the case, the jury was sequestered. Further, the record shows that some time after the verdict was returned by the jury, defense counsel claimed that one of the jurors had made a pre-trial statement showing his bias against the defendant, Robert Boehme. This matter was fully explored by the trial judge at an evidentiary hearing, and in the opinion of the trial judge, defendant failed to show any bias or prejudice of the juror or that the juror made any pre-trial statement indicating his prejudice and bias. Defendant's counsel failed to make any motion for mistrial on account of prejudicial publicity or conduct of the Court or the spectators that in his opinion created a biased atmosphere in the jurors' minds. As the Supreme Court of the State of Washington, in its opinion affirming the conviction, correctly stated, the record fails to disclose that activities occurred requiring the invocation of the rule announced by the Supreme Court of the United States in Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Paragraph (d) sets forth claims that have no foundation in fact.

█ Insofar as paragraph 9(e) is concerned, there is a key statement in the record appearing on page 193 of Volume I of the Statement of Facts. Witness Wanda Ostby had employed an attorney by the name of Frazer who was a member of the Kitsap County Bar and who was present in the courtroom at the time Mrs. Ostby was testifying. Frazer heard certain colloquy between defense counsel Peters and the prosecuting attorney McCutcheon. This colloquy involved cross-examination of Ostby concerning her activities in Kitsap County during the year 1963, and whether or not it was proper for Peters to question her concerning a charge of issuance of worthless checks that he claimed had been filed by the prosecutor of Kitsap County against Ostby. It was Peters' contention that Ostby was being intimi-

dated or threatened in order to obtain favorable testimony from her concerning her affair with the petitioner Boehme. During this colloquy, McCutcheon made the statement that "there are no pending criminal cases against the witness at this time. The check charges mentioned have long been dismissed. There are no charges pending." To this statement, Peters replied, "Supposing the check charges were conveniently dropped? Doesn't that affect the credibility of this witness? If these charges are dropped, and are you referring to a prior case in 1963? You haven't hesitated to refer to that. It's germane to all these matters as to whether or not this witness is to be believed."

Then McCutcheon replied at line 21:

"MR. McCUTCHEON: If it please the court, this is Mr. Frazer of the Kitsap County Bar, who represents the witness. I don't know if you want to hear from him at all or not.

"THE COURT: I don't think it is appropriate for him to be heard, unless he raises the question of privilege for his client under the constitution.

"MR. FRAZER: There has been misstatement by both Counsel. I want to advise—

"MR. PETERS: Object to this counsel being present."

It is well to bear in mind that all of this colloquy took place outside of the hearing of the jury. The representation made by the prosecutor was to the Court and not to the jury. Attorney Frazer tried to advise the Court that both Peters and McCutcheon were mistaken. Peters refused to let him do this, and the Court did not listen to Frazer's statement.

Further colloquy between Peters, the Court and McCutcheon on page 194 shows that the Court permitted further cross-examination by Peters to determine if, as the Court stated, "It leads to the matter of favors done in connection with a criminal case. If that is what Counsel is attempting to do, I do feel he has a right to do it." Defense counsel Peters pursued the matter, and so far as the record discloses, no reference was ever made in front of the jury to the pendency of any charge or its dismissal in Kitsap County. However, McCutcheon did ask the witness on redirect examination this question:

"Q Let me ask you this, Mrs. Ostby, are you under any coercion from the Bremerton Police Department, the court in Bremerton, the police department here or any law enforcement agency, to sit there today and tell anything but the absolute truth?

"A None whatever. I wouldn't agree to it anyway."

(Vol. I, p. 197, Statement of Facts)

The erroneous conclusion or statement of the prosecutor was made to the Court, not to the jury, and it would seem that Mr. Frazer would readily have corrected the record had he been permitted. Under these circumstances, it is difficult for the Court to see how any prejudice could have resulted to the defendant because of the erroneous statement of the prosecutor. Certainly the jury could not have been prejudiced if the statement was made outside of their hearing.

If one reads the record, one can only conclude that the proof of the defendant's guilt was overwhelming. He may not have had a perfect trial but certainly he had a fair trial.

It is now, therefore, ordered that the petition for a writ of habeas corpus of Robert E. Boehme be, and the same is hereby, denied.

It is further ordered that the time to appeal from this order shall commence on this, the 3rd day of October, 1968.