James **REARDON**

v.

John **MANSON.**

Perry **HAWKINS**

v.

Richard M. **STEINERT.**

Civ. Nos. H–77–240, H–77–497.

United States District Court,
D. Connecticut.

April 28, 1980.

---

David S. Golub, Stamford, Conn., for plaintiff.

Richard F. Jacobson, Bridgeport, Conn., Robert E. Beach, Jr., Asst. State's Attys., Wallingford, Conn., for defendant.

## RULING ON PETITIONERS' APPLICATIONS FOR WRITS OF HABEAS CORPUS

BLUMENFELD, Senior District Judge.

Petitioners James Reardon and Perry Hawkins seek habeas corpus relief from Connecticut state court convictions for drug offenses. Their petitions are predicated on the fact that the State, over objection, was allowed to use hearsay testimony to prove an essential element of the offenses charged and on the theory that the petitioners were therefore denied their right to confront their accusers as guaranteed by the sixth amendment.[1]

1. The sixth amendment provides in pertinent part:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

## I. *The Facts*

Petitioners Reardon and Hawkins were charged with violating Connecticut state drug laws in separate and unrelated informations. Reardon was charged with possession of marijuana and Hawkins was charged with selling cocaine. Under Connecticut law, as an element of each of these offenses, the State was obligated to establish the illegal narcotic nature of the substances. At both trials the State sought to carry its burden on this element of the offense by introducing the testimony of Dr. Charles Reading, one of three toxicologists employed by the State Department of Health.

Dr. Reading, who has a doctorate degree in forensic medicine, testified that in his expert opinion the substances seized from Reardon and Hawkins were marijuana and cocaine, respectively. On direct and cross-examination he conceded that his testimony was based entirely on his observations of the results of tests which were conducted out of his immediate presence by laboratory chemists under his supervision and on oral or hand-written reports from these chemists.

As his trial testimony indicates, Dr. Reading, along with two other toxicologists, supervised the work of 24 laboratory chemists.[2] Two of these chemists, Ms. Pernitis and Ms. Quintana, actually performed the tests on the substances taken from the petitioners. Reading's supervision of these chemists involved no more than directing the chemists to perform certain tests, reviewing their reports, and discussing their analyses with them. Dr. Reading admitted that he played no part in the actual performance of the tests nor did he observe the chemists performing each step of the testing process. He was simply present in the laboratory at the same time that the chemists were. The tests on petitioners' substances were just a few among the 15,000 other tests each year which Dr. Reading claims to "supervise." As counsel for petitioner points out, this suggests that Dr. Reading "supervises" over 50 tests every day.

The nature of the tests required that the chemists, Ms. Pernitis and Ms. Quintana, mechanically record data in some cases and make subjective analyses in others. Thus, for example, thin layer chromatography was used to test both substances. In performing this test the chemists prepared a slide with an extract of a known standard and another slide with the substance to be tested. The slides were then placed in a solvent solution, removed and sprayed with a particular chemical spray. This process yielded distinct dots of various colors at different locations on the slide. By comparing the dots appearing on the slide containing the known substance with those on the slide containing the unknown, the chemists were able to determine if the unknown contained chemicals similar to those known to be in the standard. With respect to this test, the chemists mechanically performed the operations and brought the slides to Dr. Reading. Dr. Reading, by examining the slides, was able to confirm independently the chemists' conclusions as to the presence of the suspected drug.

By contrast, the microscopic test for marijuana required that the chemist alone draw the ultimate conclusion. After preparing a slide with an unknown substance, the chemist examined the material with a microscope, looking for characteristics of marijuana. The chemist herself determined whether or not the material resembled marijuana and reported only her conclusions to Dr. Reading. As Dr. Reading conceded, Ms. Pernitis actually performed the microscopic evaluation of Reardon's substance, and she merely told Dr. Reading that the results were positive. He never personally examined the substance under the microscope.

Thus, with some tests the results were simply reported as positive, indicating the

---

2. At Reardon's trial, Dr. Reading testified that he and his two fellow toxicologists supervised 24 chemists. At the time of Hawkins' trial, the laboratory had only 22 chemists.

presence of narcotics. With others, the actual chemical results were shown to Dr. Reading to corroborate the chemist's own conclusions. In both trials Dr. Reading testified that he relied on all of the tests in reaching his own opinion.[3]

At the trials, over strenuous objections, Dr. Reading was allowed to testify as to the narcotic nature of the substances in question. The chemists who performed the underlying tests were never called as witnesses, and the prosecution offered no explanations for their absence. As both counsel stipulated at the hearing on these applications, Dr. Reading's testimony was the only proof on which the State relied to establish the narcotic nature of the substances.

After trial, both petitioners were convicted and appealed their convictions in the state courts. Both exhausted their state remedies by raising the constitutional confrontation claim before the Connecticut Supreme Court. Their appeals were denied,[4] and each has now filed for a writ of habeas corpus, raising the same confrontation claims in this court.

## II. *The Legal Issue*

The sixth amendment right of confrontation, applicable to the states through the fourteenth amendment, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), has repeatedly been referred to as an "essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Id.* at 405, 85 S.Ct. at 1068; *Barber v. Page*, 390 U.S. 719, 721, 88 S.Ct. 1318, 1320, 20 L.Ed.2d 255 (1968). "The primary object of the [confrontation clause is] to prevent depositions or *ex parte* affidavits . . . [from] being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of

the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

The sixth amendment promises the accused the right to confront the "witnesses against him." "It is clear that in the context of the confrontation clause, the 'witness against' the accused is the extra-judicial declarant, and not the live witness who merely narrates the hearsay at trial." *United States v. Oates*, 560 F.2d 45, 80 n.34 (2d Cir. 1977).

The testimony of Dr. Reading, in effect, merely repeated the information given him by his chemists. As to some of the tests, he simply reiterated the chemists' analysis with no first-hand knowledge of the test results. By passing along a chemist's assurance that a particular test yielded a positive result, Dr. Reading was only narrating hearsay. As to other tests where he himself observed the results of the experiments, he still was required to assume that the substances tested were in fact the substances in question, that the tests had been performed correctly, and that the appropriate standards had been used. When he examined the slides created by his chemists and then based his conclusion on the slides, he nonetheless still passed along the chemist's hearsay declaration that the tests were in fact properly conducted on the appropriate substances. As to these facts Dr. Reading had no independent knowledge.

It is beyond dispute that the chemist's extra-judicial testimony constituted a central link in the prosecution of these petitioners. Petitioners' ability to cross-examine and confront Dr. Reading obviously does

---

3. On direct examination, Dr. Reading indicated that the identity of the substances could have been determined from his personal examination of the results of a single test. However, on cross-examination he testified that he based his expert opinion on the summation of all the test results.

4. *State v. Hawkins*, 173 Conn. 431, 378 A.2d 534 (1977); *State v. Reardon*, 172 Conn. 593, 376 A.2d 65 (1977).

not satisfy their desire to confront the extra-judicial witnesses against them. Thus, it is clear that Dr. Reading's testimony was hearsay, and the only question is whether its admission offended the confrontation clause of the sixth amendment.[5]

■ Of course, not every extra-judicial declaration admitted at trial violates the sixth amendment. *E. g., Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *United States v. Puco,* 476 F.2d 1099, 1104–05 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973). Nor, on the other hand, is a particular declaration sanitized from constitutional violations simply because it is admissible under a hearsay exception in the State's rules of evidence.[6] *Dutton v. Evans, supra,* 400 U.S. at 81–82, 91 S.Ct. at 215–16 (opinion of Stewart, J.); *California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1933–34, 26 L.Ed.2d 489 (1970); *United States v. Oates, supra,* at 81; *United States v. Puco, supra* at 1102. Rather the court must determine, on a case-by-case basis, whether each extra-judicial statement is sufficiently trustworthy to be admitted into evidence. *United States v. Puco, supra,* at 1105.

■ In the Second Circuit, claims under the confrontation clause are tested against three standards. First: is the hearsay testimony "crucial" to the prosecution's case or does it have a "devastating" effect on the defense? Second: if so, has the prosecution carried its burden of establishing that the extra-judicial declarant is in fact not available? Finally: does the testimony bear other "indicia of reliability"? *Rado v. State of Connecticut,* 607 F.2d 572, 581 (2d Cir. 1979); *United States v. Oates, supra,* at 81–83; *United States v. Puco, supra,* at 1103–05; *cf. Stewart v. Cowan,* 528 F.2d 79, 84 (6th Cir. 1976); *Phillips v. Neil,* 452 F.2d 337, 347 (6th Cir. 1971), *cert. denied,* 409 U.S. 884, 93 S.Ct. 96, 34 L.Ed.2d 141 (1972).

## A. "Crucial" declaration

■ It is beyond dispute that Dr. Reading's testimony was "crucial" to the State's case. It was the only evidence which was introduced to establish one of the necessary elements of the offense—the illegal nature of the substances. As the court had occasion to indicate in *Oates*:

> "Of course, if cruciality is relevant, here the chemist's report and worksheet, unlike the hearsay statements in *Puco* and *Dutton,* were crucial. The purpose for which they were offered was to prove an essential element of the government's case, see, e. g., Stewart v. Cowan, 528 F.2d 79, 80, 83, 85 (6th Cir. 1976); State v. Wiley, 295 Minn. 411, 421, 205 N.W.2d 667, 675 (1973); State v. Matousek, 287 Minn. 344, 350, 178 N.W.2d 604, 608 (1970); State v. Tims, 9 Ohio St.2d 136 at 139, 224 N.E.2d 348 at 351; Commonwealth v. McCloud, 457 Pa. 310 at 314–15, 322 A.2d 653 at 656–57, and, as to that element, none of the other evidence in the case could have sufficed. See United States v. Puco, supra at 1104."

*Oates, supra,* at 83. Unlike the extra-judicial statements admitted in *Dutton* which were characterized as "of peripheral significance at most" and which merely corroborated the testimony of 20 eyewitnesses, Dr.

---

5. Of course, if the chemists had testified as to the results of their tests, it would have been permissible for Dr. Reading to testify as an expert and to have based his opinion on the test results. However, since the chemists did not testify as to their results, Dr. Reading had to fill that void with hearsay. It appears that the Connecticut Supreme Court considered Dr. Reading's testimony as hearsay, *State v. Reardon, supra,* at 598, 376 A.2d 63, and even the Connecticut legislature would appear to have considered this type of evidence as hearsay. *See* Conn.Gen.Stat.Ann. § 19–483. If, in fact, Dr. Reading was not testifying as to the underlying test results, then his expert opinion would not have been based on any evidence in the record and would have been excluded under Connecticut law. *See Nash v. Hunt,* 166 Conn. 418, 425–26, 352 A.2d 773 (1974); *Graybill v. Plant,* 138 Conn. 397, 403, 85 A.2d 238 (1951). Thus, it is clear that the State itself has considered these statements to be hearsay.

6. The Connecticut Supreme Court decisions in *Hawkins* and *Reardon* do not make clear the basis under state law for the admission of the statements.

Reading's testimony was the linchpin which held the State's entire case together. It was clearly crucial.

### B. *Unavailability of declarant*

The prosecution did not attempt to explain why the chemists, Ms. Pernitis and Ms. Quintana were not called to testify. This is not a case where the prosecution simply did not try hard enough to produce the underlying witnesses. *Compare Barber v. Page, supra.* Here, the prosecution did not try at all.

The number of Connecticut cases which have considered the admissibility of a supervising toxicologist's testimony instead of the testimony of his laboratory chemists suggests that this substitution has become a routine practice utilized by Connecticut prosecutors.[7] Since presumably the chemists in this case were available and were deliberately by-passed in favor of Dr. Reading, it is likely that the State was hoping to take strategic advantage of their absence. By not producing the actual chemists, the State effectively screened these less-experienced witnesses from the rigors of cross-examination. Moreover, in their place, the State substituted a witness with great experience both on the witness stand and in the practice of forensic medicine, whose testimony to the jury was buttressed by his doctorate degree. The chemists actually performing the tests had less impressive credentials.[8] Thus, unlike cases where a prosecutor has made a good-faith effort to produce the declarant, here the State prosecutor appears to have taken an intentional step designed to shield the declarant from cross-examination and artificially to strengthen the State's case by reference to the doctorate degree of the supervising toxicologist.

It has been suggested that where an extra-judicial statement is crucial to a prosecutor's case and where the prosecutor fails to establish that he made a good-faith effort to produce the out-of-court declarant, the admission of the statement constitutes a *per se* violation of the defendant's sixth amendment right without any need to examine other indicia of reliability. *Stewart v. Cowan, supra,* at 85; *Park v. Huff,* 493 F.2d 923, 933–34 (5th Cir. 1974), *rev'd on rehearing en banc,* 506 F.2d 849 (5th Cir.) (over dissent of six judges), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). In fact, as the Second Circuit has had occasion to suggest:

> "[I]ndeed, there is reason to believe that after *Mancusi v. Stubbs,* 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); and *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the government does bear the burden of producing extra-judicial declarants, or of demonstrating their genuine unavailability whenever the extra-judicial statements being offered at trial are crucial to the government's case."

*Oates, supra,* at 83 (footnotes omitted).

While the Second Circuit has never had to resolve this specific question, in *Oates* the court suggested that a "persuasive argument" could be made for the petitioners' position:

> "Beyond the necessary demonstration that the extra-judicial statement is trustworthy, there arises a real question, which this case would present, whether the prosecutor bears the additional burden of producing all available declarants upon whose extra-judicial declarations the government intends to rely, or, in the

---

7. *See, e. g., State v. Hawkins, supra; State v. Reardon, supra; State v. Brown,* 169 Conn. 692, 703–04, 364 A.2d 186 (1975); *State v. Addazio,* 169 Conn. 416, 420–21, 363 A.2d 153 (1975); *State v. Marsh,* 168 Conn. 520, 530, 362 A.2d 523 (1975); *State v. Johnson,* 166 Conn. 439, 443–44, 352 A.2d 294 (1974).

8. The record on this motion is not complete, in that the educational background of the chemists is not in evidence. At the hearing, however, petitioners' counsel informed the court without objection from the State that none of the chemists had doctorate degrees, and the continual reference to Miss Pernitis and Mrs. Quintana instead of Dr. Pernitis and Dr. Quintana would seem to confirm this.

alternative, showing the unavailability of these declarants.[39]

[39] "A persuasive argument in support of requiring the prosecution to call an extra-judicial declarant whose statement the government intends to introduce at trial is that by not calling such a witness the prosecutor is, in effect, shielding the witness' testimony from cross-examination, . . . and it has also been argued that the disadvantage the defendant suffers because of the prosecutor's failure to call the extra-judicial declarant is not ameliorated by the defendant's ability to call the extra-judicial declarant as his own witness. . . . While Rules 607 and 611 of the new Federal Rules of Evidence, by allowing a party to lead and impeach his own witness, may have removed some of the former disadvantage suffered by a defendant, part of the detriment, well explicated in *Phillips v. Neil,* 452 F.2d 337 at 348 (6th Cir.) and The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 195 (1971), remains. In any event, the right of confrontation is broader than the right to cross-examination, . . . and it is the prosecutor who should have the burden of producing witnesses against the defendant . . . ."

*Oates, supra,* at 82 (citations omitted).

■ Because of the posture of this case, this court need not now conclude whether such a *per se* rule should apply in every case. It is enough to say that where a crucial statement of an extra-judicial declarant is involved and where the State does not establish that it made good-faith efforts to produce the declarant, the State, at the very least, must demonstrate that the statement bears substantial independent indicia of reliability before it can be admitted against the accused.

C. *Other indicia of reliability*

No such indicia are present here. This was not a test performed by a neutral third party. *Compare United States ex rel. Henson v. Redman,* 419 F.Supp. 678, 682 (D.Del. 1976); *United States ex rel. Lurry v. Johnson,* 378 F.Supp. 818, 822 (E.D.Pa.1974), *aff'd,* 510 F.2d 971 (3d Cir. 1975). "Chemists at the laboratory, are without question, important participants in the prosecutorial effort." *Oates, supra,* at 68. No independent corroborating evidence was presented to substantiate the truth of the out-of-court statements. *Compare Dutton v. Evans, supra.* Nor was the nature of the tests purely mechanical. *Compare United States ex rel. Henson v. Redman, supra; United States ex rel. Lurry v. Johnson, supra.* Rather, they involved subjective analysis of some substances by those who were never present in court to defend their analyses. The State placed nothing in the record which demonstrated the reliability and competence of the extra-judicial declarants apart from Dr. Reading's generalized assertions that he relied on his chemists. *Compare Boehme v. Maxwell,* 309 F.Supp. 1106, 1109 (W.D.Wash.1968), *aff'd,* 423 F.2d 1056 (9th Cir. 1970). Their educational backgrounds and length of experience were never revealed. In short, apart from the unfounded assumption that the State would not have acted unfairly, nothing has been offered to substantiate the reliability of the hearsay statements.

III. *Conclusion*

In cases such as these, there is always a natural temptation to assume that the State acted with utmost care and good faith in investigating and prosecuting the defendants. Particularly where a state laboratory processes thousands of tests, there is a strong reluctance to assume that the State's procedures were either careless or deliberately designed to produce unjust results. Consequently, trial courts may often be faced with an inclination to presume the fairness and regularity of the State's efforts. It must be remembered, however, that the sixth amendment was designed to protect the accused from this very inclination. It was because of the potential for the government's abuse of its role as prosecutor that the sixth amendment was first adopted. Where the balance is between the convenience of the prosecutor and the constitutional right of confrontation by an accused, the latter outweighs the former.

As the court in *Oates* noted, cross-examination of the actual chemists by the petitioners would have afforded them an opportunity to explore the chemists' "personal qualifications and experience" and would have allowed them to ascertain whether the tests were " 'mere routine recordation[s] of facts,' " whether the tests were "correctly

performed," and whether any "machines used were in good working order." *Oates, supra,* at 81–82. The sixth amendment required nothing less.

IT IS ORDERED that a writ of habeas corpus should issue out of this court discharging the petitioners from custody, unless petitioners are afforded a new trial within 60 days.