**James REARDON, Petitioner-Appellee,**

v.

**John R. MANSON,**
**Respondent-Appellant.**

**Perry HAWKINS, Petitioner-Appellee,**

v.

**Richard STEINERT,**
**Respondent-Appellant.**

**No. 217, Docket 80–2176.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1980.

Decided March 18, 1981.

Robert E. Beach, Jr., Asst. State's Atty., Connecticut, Wallingford, Conn., for respondent-appellant.

David S. Golub, Stamford, Conn. (Silver, Golub & Sandak, P. C., Stamford, Conn., on brief), for petitioners-appellees.

Before FEINBERG, Chief Judge, VAN GRAAFEILAND, Circuit Judge, and HOLDEN,* District Judge.

HOLDEN, District Judge:

The State of Connecticut appeals from the order of the United States District Court for the District of Connecticut, 491 F.Supp. 982, that granted the applications of the appellees for writs of habeas corpus following separate unrelated trials, convictions and unsuccessful appeals in the state courts of Connecticut. The petitioner Reardon was charged with the unlawful possession and possession with intent to sell marijuana. Hawkins was convicted of unlawful control and sale of cocaine. The convictions were affirmed in separate appeals by the Supreme Court of Connecticut in 1977.

*The Reardon Petition*

The record on appeal establishes that at both trials the State sought to prove the

---

---

* Of the District of Vermont, sitting by designation.

substances were marijuana and cocaine, respectively, by presenting Dr. Charles Reading, one of three toxicologists employed in the laboratory of the State Department of Health. Dr. Reading holds a degree in forensic medicine from the University of Maryland. Following employment by the New Jersey state police as its principal chemist, he has been employed by the Connecticut Department of Health since 1972.

The state laboratory is maintained, pursuant to statutes, by the health department and functions under the direction of Dr. Reading's immediate superior, the chief state toxicologist. The Connecticut statute requires the chief toxicologist to establish the standards for analysis of controlled drugs by qualified professional toxicologists and chemists operating under his direction and supervision.[1] The laboratory staff, in addition to the chief toxicologist, included Dr. Reading and two other toxicologists who jointly supervise the work of twenty-four chemists. The chemists perform the actual testing procedures and submit hand written reports of the materials used, the scientific data compiled and the test results.

The laboratory operating procedures in effect at the time of Dr. Reading's testimony required a toxicologist to take custody of the suspected substance. The supervising toxicologist removed the material from a vault and delivered it to a particular chemist to conduct a series of three tests which were performed according to the direction and supervision of the toxicologist. During the testing the readings of the instrumentation involved were recorded by the analyst. The results of each testing procedure were delivered to the supervising toxicologist with the working papers, including observa-

tions and recorded scientific data. The supervising toxicologist then discussed these reports with the chemist. At the conclusion of these procedures the supervising toxicologist was called upon to make an independent evaluation and judgment of the nature of the tested material on the basis of the recorded scientific data. Dr. Reading testified that the chemist who performed the test of the Reardon material was a Miss Pernitis.[2] Dr. Reading personally supervised the work done by this chemist, examined the data recorded and the results of her testing procedure. On the strength of this information Dr. Reading was asked to state his opinion that the material tested was marijuana. Over objection by Reardon's counsel that the expert's opinion was based on hearsay, the court received Dr. Reading's opinion that the substance was marijuana.

Toward the close of direct examination, counsel moved for the production of any laboratory reports and notes relating to the examination of the controlled substances for use in cross-examination. The state's attorney informed the court that all laboratory information had been provided by voluntary disclosure. The trial court inquired if that was all the data available. The witness responded that the only other materials were "analytical notes." To understand them would require bringing the laboratory supplies and materials into court. The trial record indicates the court was satisfied that the defendant had been provided all the materials available under the applicable criminal rules of discovery.[3]

In cross-examination, defense counsel searched all aspects of the direct examination of the State's expert. The witness

1. Section 19–483, General Statutes, is quoted and discussed in *State v. Reardon*, 172 Conn. 593, 376 A.2d 65 (1977).

2. Dr. Reading identified the three tests performed by Miss Pernitis as thin layer chromatography, microscopic examinations, and chemical examination, and described each procedure in detail to the jury. Thin layer chromatography is a technique which causes separation of the chemical components of a substance, and thus allows analysis and identification of each such chemical component. Chemical examination involves treating those compo-

nents with a standard dye which causes a unique color reaction if certain chemicals are present. Microscopic examination allows highly detailed observation of the physical characteristics of a substance. Note 9, *infra*.

3. The following colloquy embodies the objection of Reardon's counsel:
   MR. MAY: Your Honor, I am going to object on the basis that this is not the man who performed the tests. Miss Pernitis is the individual who performed the test. And I think any testimony with respect to this man is totally hearsay. And that the best evi-

reiterated that the actual testing was done by the chemist Miss Pernitis while the witness was present in the laboratory and that the chemist's desk was approximately twelve feet away from the toxicologist's desk. He observed her—"but not specifically to each detail of the test." At the conclusion of the testing procedure the chemist handed the witness her handwritten notes which reported her observations and findings. The cross-examination of Dr. Reading is reported in some thirty pages of the trial transcript.[4]

The record of the trial submitted in this appeal fails to disclose any request by the defense to have the State present the chemist Miss Pernitis to testify concerning the testing procedures performed. There is no indication that the defense sought to obtain samples of the accused substance for independent expert examination. All of the objections made by the defendant to Dr. Reading's testimony were advanced on the grounds of hearsay. The record on appeal fails to disclose any assertion by the defendant that the evidence presented to Dr. Reading violated his constitutional rights either to confront Miss Pernitis or compel her attendance.

The constitutional claim was made for the first time in Reardon's appeal to the Supreme Court of Connecticut.[5] *State v. Reardon,* 172 Conn. 593, 376 A.2d 65 (1977).

### The Hawkins Proceedings

The state proceedings against the petitioner Hawkins followed much the same pattern. Hawkins was convicted under the Connecticut criminal statutes for unlawful trafficking in cocaine. Dr. Reading was called as the state's witness to establish that the substance purchased from the defendant in a controlled sale on April 3, 1974, was cocaine. The testing procedures employed were substantially similar, except that the known and unknown substances were first submitted to ultraviolet ray spectrophotometry, followed by thin layer chromatography and chemical analysis.[6] The tests in the Hawkins case were performed by the staff chemist Esther Quintana under Dr. Reading's supervision. He provided her with the materials, the known and unknown substances to be tested for comparison and directed her in the tests to be performed. Dr. Reading personally examined the test results. Hawkins' counsel objected to Dr. Reading's opinion, asserting

dence, if that is the situation, is the lab report itself. This man is not the man to testify with respect to that.

MR. FLANAGAN: I will offer the lab report itself, if your Honor pleases.

MR. MAY: Your Honor, I am going to object to the lab report.

MR. FLANAGAN: I thought he just wanted the lab report.

MR. MAY: I said that was the best evidence.

MR. FLANAGAN: I am offering it.

MR. MAY: I am going to object to the lab report.

MR. FLANAGAN: I will withdraw the offer, if your Honor pleases. I think the argument of counsel is so totally unfounded, it needs no rebuttal.

THE COURT: Overrule the objection.

4. Reardon's counsel and the court questioned the witness further and in great detail on each of the three procedures, including the need to have the microscope in court to review the observations made by this instrument. The court did not require the witness to produce all of the laboratory notes made by the chemical analyst. At one point counsel for the State stressed that the defense was at liberty to call any expert of its choice to testify on the sub-

ject. At the court's request, Dr. Reading drew a series of diagrams on the courtroom blackboard to clarify each step taken in thin layer chromatography and explained each step to the jury. He was examined by the defense concerning the various aspects of the testing procedures. He also answered extensive questions on his background and the extent of his knowledge of plant identification.

5. Reardon's conviction was affirmed on April 5, 1977. His application for a writ of habeas corpus was filed in the district court on May 6, 1977 and he was released on bond on July 12, 1977.

6. Chromatography is "a process of separating solids, gases or liquids in a mixture or solution by adsorption as the mixture flows over the adsorbent medium, often in a column, each substance finally appearing in the medium at a different level or band that is often colored." Spectrophotometry is "the process of comparing photometrically the relative intensities of light in different parts of a spectrum." Webster's Third International Unabridged Dictionary (1971).

shortages in the chain of custody, the witness' qualifications and hearsay.[7]

*The Reardon Appeal*

The facts found by the Connecticut Supreme Court in rejecting Reardon's constitutional claim are reported in the court's opinion, set forth in the margin.[8] The court held:

> It was not error to admit the opinion of Dr. Reading, in any event, in view of the context of his testimony as a whole. Under the facts established in this case, the opinion of Dr. Reading, a state toxicologist, whose qualifications as an expert were not in issue, was admissible although based in part upon a test or tests conducted by an expert, a chemist, Miss Pernitis, upon which he could reasonably rely and where there was reasonable necessity for it in accordance with laboratory procedures adopted and undertaken pursuant to his supervision and direction; especially since, under the circumstances of this case, not only was his professional opinion founded in part upon routine tests and reports directed and supervised by him but also in part upon his firsthand personal knowledge and observation of the substance in question.

*State v. Reardon, supra*, 172 Conn. at 598, 376 A.2d 65 (citations omitted).

The Connecticut court went on to decide Reardon's Sixth Amendment claim. It held—

---

7. The objections in both cases were stated on similar grounds.

8. The state toxicological laboratory, pursuant to § 19–483 of the General Statutes, is under the direction of the state's chief toxicologist, who "shall establish the standards for analytical tests to be conducted with respect to controlled drugs ... by qualified professional toxicologists and chemists operating at his direction and shall have the general responsibility for supervising such analytical personnel in the performance of such tests." It is staffed by three toxicologists, including Dr. Reading, and twenty-four chemists, and receives approximately 20,000 cases each year. The chemists perform the actual analyses of material under the supervision of the toxicologists. In each case a toxicologist takes the material to be analyzed, gives it to the chemist involved, directs the work to be done, thereafter receives the analyst's report, discusses the results with the chemist and makes an "independent decision as to what has been accomplished."

Dr. Reading testified at length on direct and cross-examination as to the manner in which drug identifications were conducted in the state toxicological laboratory in this and other similar cases.[2] A microscopic test, a thin-layer chromatography test and a chemical test were conducted. He readily admitted under cross-examination that he did not see the results of the microscopic test conducted by the chemist, Miss Pernitis, that this test was not absolute and that probably hundreds of other plants have cystolithic hairs. The thin-layer chromatography test separates the chemically active ingredients of the sample material upon a small, treated celluloid plate using a volatile solvent; a plate using the sample material is prepared simultaneously with a plate using a known marijuana sample as a standard, so that the two plates can be visually compared. The chemical test treats the separated ingredients with a developer which turns any THC present a distinctive pink color. Dr. Reading testified that the thin-layer test is a specific test indicative of marijuana containing THC, that he personally observed the developed plates and that this test alone is sufficient to establish the presence of marijuana while the microscopic test is not absolute.

. . . .

There was testimony by Dr. Reading before the jury that he had personal knowledge upon which to rely in forming his opinion, including personal knowledge of the identity of the tested material, since he received it from the safe and gave it to the chemist for testing; personal knowledge of the procedures used to identify the material, since he directed the chemist as to what tests should be done; most importantly, he personally observed the results of the thin-layer chromatography and chemical tests, which he testified conclusively identified the presence of marijuana containing THC. He also testified, inter alia, that he had examined plantlike material for the presence of marijuana literally thousands of times, that he observed Miss Pernitis as she performed the tests although he did not see each detail, that her desk was approximately twelve feet from his and that she brought him the rough notes from which the final report was completed. He also testified that he personally supervised and examined tests which were completed by her.

2 The defendant did not dispute Dr. Reading's qualifications as an expert witness; or the fact that the material seized under the search warrant was the same substance that was tested. See *State v. Johnson*, 162 Conn. 215, 229–31, 292 A.2d 903.

The jury's consideration of Dr. Reading's testimony, which we have held was admissible and which bore strong indicia of reliability, and upon which the defendant had a full and fair opportunity to cross-examine, did not deprive the defendant of the right of confrontation guaranteed by our state or federal constitutions.

*Id.* at 599, 376 A.2d 65.

In Hawkins' appeal the court rejected the appellant's claim of error in the admission of the testimony of Dr. Reading as a state toxicologist.

**9.** *The Facts*

Dr. Reading, who has a doctorate degree in forensic medicine, testified that in his expert opinion the substances seized from Reardon and Hawkins were marijuana and cocaine, respectively. On direct and cross-examination he conceded that his testimony was based entirely on his observations of the results of tests which were conducted out of his immediate presence by laboratory chemists under his supervision and on oral or hand-written reports from these chemists.

As his trial testimony indicates, Dr. Reading, along with two other toxicologists, supervised the work of 24 laboratory chemists.[2] Two of these chemists, Ms. Pernitis and Ms. Quintana, actually performed the tests on the substances taken from the petitioners. Reading's supervision of these chemists involved no more than directing the chemists to perform certain tests, reviewing their reports, and discussing their analyses with them. Dr. Reading admitted that he played no part in the actual performance of the tests nor did he observe the chemists performing each step of the testing process. He was simply present in the laboratory at the same time that the chemists were. The tests on petitioners' substances were just a few among the 15,000 other tests each year which Dr. Reading claims to "supervise." As counsel for petitioner points out, this suggests that Dr. Reading "supervises" over 50 tests every day.

The nature of the tests required that the chemists, Ms. Pernitis and Ms. Quintana, mechanically record data in some cases and make subjective analyses in others. Thus, for example, thin layer chromatography was used to test both substances. In performing this test the chemists prepared a slide with an extract of a known standard and another slide with the substance to be tested. The slides were then placed in a solvent solution, removed and sprayed with a particular chem-

For the same reasons that we found no error in admitting similar evidence in the Reardon case (decided during the pendency of Hawkins' appeal), we find no abuse of the court's discretion in admitting Reading's testimony in this case.

*State v. Hawkins*, 173 Conn. 431, 378 A.2d 534 (1977).

*The Ruling on the Petitioners' Applications for Writs of Habeas Corpus*

After stating the facts upon which the applications for writs of habeas corpus were granted, the district court, in its memorandum of decision [9] concluded:

ical spray. This process yielded distinct dots of various colors at different locations on the slide. By comparing the dots appearing on the slide containing the known substance with those on the slide containing the unknown, the chemists were able to determine if the unknown contained chemicals similar to those known to be in the standard. With respect to this test, the chemists mechanically performed the operations and brought the slides to Dr. Reading. Dr. Reading, by examining the slides, was able to confirm independently the chemists' conclusions as to the presence of the suspected drug.

By contrast, the microscopic test for marijuana required that the chemist alone draw the ultimate conclusion. After preparing a slide with an unknown substance, the chemist examined the material with a microscope, looking for characteristics of marijuana. The chemist herself determined whether or not the material resembled marijuana and reported only her conclusions to Dr. Reading. As Dr. Reading conceded, Ms. Pernitis actually performed the microscopic evaluation of Reardon's substance, and she merely told Dr. Reading that the results were positive. He *never personally examined the substance* under the microscope.

Thus, with some tests the results were simply reported as positive, indicating the presence of narcotics. With others, the actual chemical results were shown to Dr. Reading to corroborate the chemist's own conclusions. In both trials Dr. Reading testified that he relied on all of the tests in reaching his own opinion.[3]

[2] At Reardon's trial, Dr. Reading testified that he and his two fellow toxicologists supervised 24 chemists. At the time of Hawkins' trial, the laboratory had only 22 chemists.

[3] On direct examination, Dr. Reading indicated that the identity of the substances could have been determined from his person-

The testimony of Dr. Reading, in effect, merely repeated the information given him by his chemists. As to some of the tests, he simply reiterated the chemists' analysis with no first-hand knowledge of the test results. By passing along a chemist's assurance that a particular test yielded a positive result, Dr. Reading was only narrating hearsay. As to other tests where he himself observed the results of the experiments, he still was required to assume that the substances tested were in fact the substances in question, that the tests had been performed correctly, and that the appropriate standards had been used. When he examined the slides created by his chemists and then based his conclusion on the slides, he nonetheless still passed along the chemist's hearsay declaration that the tests were in fact properly conducted on the appropriate substances. As to these facts, Dr. Reading had no independent knowledge.

It is beyond dispute that the chemist's extrajudicial testimony constituted a central link in the prosecution of these petitioners. Petitioners' ability to cross-examine and confront Dr. Reading obviously does not satisfy their desire to confront the extrajudicial witnesses against them. Thus, it is clear that Dr. Reading's testimony was hearsay, and the only question is whether its admission offended the confrontation clause of the sixth amendment.

The district court found that Dr. Reading's testimony was crucial to the State's case in that it was the only evidence presented on the illegal nature of the substances. The court observed that the prosecution did not attempt to explain why the chemists Pernitis and Quintana were not called to testify. The court went on to state:

> al examination of the results of a single test. However, on cross-examination he testified that he based his expert opinion on the summation of all the test results.

10. It is worth noting, however, that in *United States v. Oates, supra,* the court's opinion, in construing Federal Rules of Evidence 803(6) took pains to "stress, however, that we do not

Since presumably the chemists in this case were available and were deliberately by-passed in favor of Dr. Reading, it is likely that the State was hoping to take strategic advantage of their absence.... Thus, unlike cases where a prosecutor has made a good faith effort to produce the declarant, here the State prosecutor appears to have taken an intentional step designed to shield the declarant from cross-examination and artificially to strengthen the State's case by reference to the doctorate degree of the supervising toxicologist.

While the district court declined to find a per se violation of the petitioners' right to confrontation, it stated:

> It is enough to say that where a crucial statement of an extra-judicial declarant is involved and where the State does not establish that it made good faith efforts to produce the declarant, that State, at the very least, must demonstrate that the statement bears substantial independent indicia of reliability before it can be admitted against the accused.... No such indicia are presented here.

Relying primarily on this court's opinion in *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977),[10] the district court ordered that the writ issue discharging the petitioners from custody unless they were afforded a new trial within sixty days.

*Discussion*

The factual determinations by the federal district court and those reported in the opinion of the Connecticut Supreme Court appear to be in conflict in several respects.

Judge Blumenfeld treated the chemists as extra-judicial declarants. The Supreme Court of Connecticut regarded them to be collectors of trustworthy scientific data who performed testing procedures in keeping

> decide whether appellant's right to confrontation was violated here." The appeal in the federal conviction was decided on "narrow statutory grounds." 560 F.2d at 80. Moreover, the chemist who testified in *Oates* had never worked with the unavailable witness, had never observed him and had no oral or written communications with the analyst. 560 F.2d at 65.

with their prescribed duties. The Connecticut court found the scientific facts gathered by the chemists under the direction and supervision of the expert toxicologist were reliable and trustworthy. The district court found that no indicia of reliability could be assigned to the extra-judicial declarations of the chemists who performed the tests. The state court found the results of the thin layer chromatography and chemical tests were personally observed by Dr. Reading. The district court found that Dr. Reading's opinion, based on these results, was founded on assumptions that were unsupported in the evidence. The state court determined there was reasonable necessity for Dr. Reading's reliance on the findings of the chemist Pernitis. The federal court was persuaded that the witnesses were deliberately by-passed by the State to advance the interests of the prosecution.

The proceedings in the district court, by stipulation, were submitted on the transcript of Dr. Reading's testimony at the state trials of Reardon and Hawkins. The court noted and made passing reference to the petitioners' appeals.

This appeal presents again the inevitable tension that develops when a federal district court overturns a state criminal con-

viction, which has been affirmed on appeal, because of an asserted denial of fundamental constitutional protections in the enforcement of the state criminal law. It touches sensitive areas of federalism and invokes concepts of comity which should prevail within the state and federal systems. *E. g., Sumner v. Mata,* —— U.S. ——, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Forman v. Smith,* 633 F.2d 634 (2d Cir. 1980). Here, as in *Sumner v. Mata,* the constitutional claim was not raised at the trial; it was first considered and decided at the state appellate level. Both the state and federal courts considered and based their findings on transcripts of Dr. Reading's testimony at the petitioners' state trials. The findings of the Connecticut Supreme Court are stated in *State v. Reardon, supra,* 172 Conn. 593, 376 A.2d 65 and *State v. Hawkins, supra,* 173 Conn. at 431, 378 A.2d 534.

During the pendency of this appeal the Supreme Court of the United States decided *Sumner v. Mata, supra,* on a record in similar context to that presented for our review where there was no specific reference to 28 U.S.C. § 2254(d).[11] The Court stated:

Section 2254(d) applies to cases in which a state court of competent jurisdic-

---

11. 28 U.S.C. § 2254(d) provides:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitu-

tional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provi-

tion has made "a determination after a hearing on the merits of a factual issue." It makes no distinction between the factual determinations of a state trial court and those of a state appellate court. Nor does it specify any procedural requirements that must be satisfied for there to be a "hearing on the merits of a factual issue," other than the habeas applicant and state or its agent be parties to the state proceeding and that the state court determination be evidenced by "a written finding, written opinion, or other reliable and adequate written indicia." Section 2254(d) by its terms thus applies to factual determinations made by state courts, whether the court be a trial court or an appellate court. Cf. *Swenson v. Stidham,* 409 U.S. 224, 230, 93 S.Ct. 359, 363, 34 L.Ed.2d 431 (1972). This interest in federalism recognized by Congress in enacting § 2254(d) requires deference by federal courts to factual determinations of all state courts. This is true particularly in a case such as this where a federal court makes its determination based on the identical record that was considered by the state appellate court and where there was no reason for the state trial court to consider the issue because respondent failed to raise the issue at that level. See *Souza v. Howard,* 488 F.2d 462 (CA1 1973). In fact, if the state appellate court here had declined to rule on the "identification" issue because it had not been properly raised in the trial court, the federal court would have been altogether barred from considering it absent a showing of "cause" or "prejudice." *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

*Sumner v. Mata, supra,* 101 S.Ct. at 769.

A divided panel of the Court of Appeals for the Ninth Circuit in *Mata v. Sumner,* 611 F.2d 754 (9th Cir. 1980) reversed the denial of habeas corpus petition by the district court, but failed to apply the "presumption of correctness" mandated by

§ 2254(d). Here, the district court, after noting the state convictions and the exhaustion of state remedies, apparently found facts substantially different from those reported in the opinion of the Connecticut Supreme Court, and also made no mention of § 2254(d).

The majority opinion of the Supreme Court in *Sumner* considered and dealt with the problem.

When it enacted the 1966 amendment to 28 U.S.C. § 2254, Congress specified that in the absence of the previously enumerated factors one through eight, the burden shall rest on the *habeas* petitioner, whose case by that time had run the entire gamut of a state judicial system, to establish "by convincing evidence that the factual determination of the State court was erroneous." 28 U.S.C. § 2254(d). Thus, Congress meant to insure that a state finding not be overturned merely on the basis of the usual "preponderance of the evidence" standard in such a situation. In order to ensure that this mandate of Congress is enforced, we now hold that a habeas court should include in its opinion granting the writ the reasoning which led it to conclude that any of the first seven factors were present, or the reasoning which led it to conclude that the state finding was "not fairly supported by the record." 100 S.Ct. at 771.

The Court referred to *Taylor v. Lombard,* 606 F.2d 371 (2d Cir.) *cert. denied sub nom., Lombard v. Taylor,* 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980), in which "the Federal Court of Appeals indicated in the course of its opinion full awareness of § 2254(d) and after an examination of the same documentary evidence on which the state court relied it expressly concluded that the state court finding to the contrary was not entitled to deference by reason of § 2254(d)." 100 S.Ct. at 769.

But in this case, just as in *Sumner,* it does not appear that the court below relied on

sions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall

rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

any of the exceptions provided in subsection 1–8 of § 2254(d), quoted supra. Moreover, as in *Sumner*, the constitutional point was first passed upon by an appellate state court, as we have already noted; the federal habeas court considered the constitutional issues solely on the factual record made in the state courts; the court granting the writ failed even to mention § 2254(d), and despite the petitioner's failure to raise the constitutional issue in the state trial court, the state appellate court considered the issue on the merits and the federal courts did, as well.

Accordingly, we remand the case for further consideration in light of this opinion. Upon such reconsideration, the district court should enter a new judgment and the appeal therefrom, if any, should come to this panel, if practicable.[12]

12. On remand, the district court also may wish to consider the effect of the Connecticut statutes brought to our attention at oral argument which might have allowed discovery of the substances examined and which apparently now provide a procedure by which the report of the state laboratory may be admitted into evidence unless the defendant indicates that he intends to challenge the narcotic character of the alleged controlled substance.