478 A.2d 695

Craig Wesley MOON

v.

STATE of Maryland.

No. 87, Sept. Term, 1982.

Court of Appeals of Maryland.

July 19, 1984.

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Alexander L. Cummings, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

COLE, Judge.

Once again Craig Wesley Moon has petitioned this Court for relief. Moon's difficulties stem from his involvement in an automobile accident of February 18, 1979, on U.S. Route 140. Moon was travelling north when he collided with a vehicle in the southbound lane killing the driver and passenger of that vehicle. He was tried and convicted of two counts of automobile manslaughter, two counts of homicide by motor vehicle while intoxicated, reckless driving, driving while intoxicated, negligent driving and failing to drive on the right half of the road. The first time this matter came to our attention the State requested our review of a *per curiam* opinion of the Court of Special Appeals reversing Moon's conviction because that Court determined that certain test results were received into evidence in violation of Md.Code (1974, 1980 Repl.Vol.) §§ 10–302 to 10–309, Courts and Judicial Proceedings Article. *Moon v. State*, No. 154, September Term, 1980, filed October 30, 1980. This Court reversed the Court of Special Appeals because we held that the blood taken from Moon and the chemical test performed thereon were done to determine treatment required rather than as evidence for criminal prosecution. We remanded this case to the court to consider the issues raised but not decided. *State v. Moon*, 291 Md. 463, 436 A.2d 420 (1981). On remand the Court of Special Appeals affirmed Moon's convictions. *Moon v. State*, No. 154, September Term, 1980, *per curiam* opinion filed February 10, 1982.

Thereafter this Court granted Moon's petition for certiorari and issued its *per curiam* order

without affirmance or reversal, with instructions to answer the question "Were the results of Petitioner's blood alcohol and osmolality tests admitted into evidence in violation of his constitutional right of confrontation?" [*Moon v. State*, 293 Md. 593, 445 A.2d 703 (1982).]

On remand the Court of Special Appeals concluded that because of their objective nature, "the admission of Moon's blood alcohol and osmolality tests was not in violation of his constitutional right of confrontation." *Moon v. State*, No. 154, September Term, 1980, *per curiam* opinion filed June 23, 1982, at 1.

Moon filed a petition for writ of certiorari which we granted to consider the constitutional issue raised. Before us Moon contends that his right of confrontation and cross-examination was violated by admitting the hospital tests into evidence without presenting the testimony of the technician who performed the chemical tests. We shall recite such of the facts as are necessary to place the issue in proper focus.

The accident occurred on February 18, 1979, at approximately 12:30 a.m. Testimony at trial indicated that prior to the accident Moon's car was seen proceeding erratically at a high rate of speed. Persons arriving at the scene noted an odor of alcohol in Moon's car. The medical attendant accompanying Moon in a State Police helicopter to the University of Maryland Shock Trauma Unit detected an odor of alcohol on Moon's breath. At the hospital the attending physician ordered x-ray examinations and drug screening tests to be performed. An osmolality test was performed in the clinical laboratory of the Shock Trauma Unit and a blood alcohol test was performed in the hospital laboratory. The osmolality reading was 347 and the blood alcohol concentration was determined to be 0.165%. These tests results were a part of and included in Moon's hospital records. The parties stipulated that the hospital records were kept in the ordinary course of the hospital's business and it was unnecessary to produce the custodian of the records to authenticate the file as pertaining to Moon. However, the

stipulation did not extend to the admissibility of the osmolality and blood alcohol test results. The defense maintained that before the question of admissibility could be resolved it had the right to confront and cross-examine the laboratory technician who conducted the tests and obtained the results. The State argued that these tests were routine procedures followed by the hospital and were, therefore, admissible under the statutory business records exception to the hearsay rule as provided in Maryland Code (1974, 1980 Repl.Vol.) § 10–101, Courts and Judicial Proceedings Article. Thus, the State persisted that the defendant's right to confront the witnesses against him was outweighed by the inherent trustworthiness of the records and the fact that the laboratory technician was present and available in the courtroom at the time of trial was of no significance. The State, therefore, declined to call the technician. Because the defense was unwilling to vouch for the technician's credibility, it, too, refused to call him as a witness.

The trial court admitted the hospital records as business records under the statute, and the State called Dr. Yale H. Caplan, Chief Toxicologist of the State Medical Examiner's Office, over objection, to interpret the results of the blood alcohol and osmolality tests. Dr. Caplan testified that he was generally familiar with the blood testing procedures used at University Hospital; that an osmolality test is an objective test conducted prior to treatment to indicate preliminary if alcohol was involved in the condition of the patient; that the osmolality test is not a definitive test of alcohol but only an indicator; that a 347 osmolality reading is consistent with a blood alcohol concentration of 0.15 or 0.16%; that the blood analysis is very definitive with a high degree of precision and accuracy; that a person with a blood alcohol level of 0.165% will experience heightened self-confidence, increased reaction time, decreased concentration and impaired vision.

In addition to objecting to Dr. Caplan's testimony, Moon claims he was denied the right to question the authenticity of these tests because the State did not produce the labora-

tory technician. Moon contends that the blood alcohol test report is saddled with several significant discrepancies. First, the report does not state his name but rather contains the description "Male Doe 8515" in the blank following the notation "patient." He admits that other documents in the hospital report specify his name and also contain the same number 8515. Moon further notes that the toxicology report indicates the time of blood withdrawal as "2–18–79 2:49 a.m."; however, the date of the report is indicated as "2–21–79." Moon argues that without the testimony of the technician, the trial court cannot be certain that the report is about him or why the blood test and/or report was not made until three days after the test was allegedly conducted. He maintains that the timeliness of a report has direct bearing on its reliability. Thus, Moon squarely poses before us the question of whether admitting the hospital records into evidence without first producing the laboratory technician as a witness violated his constitutional right of confrontation.

The Sixth Amendment to the United States Constitution requires that: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witness against him ...." Article 21 of the Maryland Declaration of Rights requires that "in all criminal prosecutions, every man hath a right ... to be confronted with the witnesses against him...." We note, therefore, that these provisions secure "the same right." *Crawford v. State,* 282 Md. 210, 211, 383 A.2d 1097 (1978) (citing *State v. Collins,* 265 Md. 70, 288 A.2d 163 (1972)). Furthermore, because the Sixth Amendment Confrontation Clause has been held applicable to the states, *see Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), the Supreme Court's interpretation of the federal right to confrontation is binding upon this State. Nevertheless, because the Maryland right has been a part of our law since 1776, a brief review of both the major Maryland and Supreme Court cases interpreting the confrontation right where the hearsay rule has been involved is in order.

The first Maryland case in this area is *Johns v. State*, 55 Md. 350 (1881), in which the defendant was indicted as a defaulter under the Act of 1872, ch. 329, providing that the Comptroller's certificate showing the taxes due shall "be received as *prima facie* evidence of such defalcation." *Id.* at 359. Johnson contended that admitting the certificate violated his right to be confronted by the witnesses against him. The Court, however, rejected this argument, noting that this "provision of the Declaration of Rights is not to be understood as excluding all other evidence except oral evidence of witnesses produced in court." *Id.* at 360.

The Court of Appeals later discussed *Johns* in *Jones v. State*, 205 Md. 528, 109 A.2d 732 (1954). In that case, the defendant had been convicted of abortion. At trial, the prosecuting witness' testimony as to her pregnancy was uncertain; therefore, the State sought to prove pregnancy through the testimony of the head of the department of obstetrics and gynecology at the hospital in which the victim had been treated after the "abortion." The doctor had never seen the victim; however, he had examined her hospital records and brought them to court. The defense objected to admitting the hospital records without referring to the right of confrontation. Thereafter, the doctor testified about the substance of what was contained in the records without any reference to those records. The Court held that because the doctor gave the impression of testifying from personal knowledge as if he were her attending physician, permitting such testimony was erroneous.

Even though the hospital record was neither offered in evidence nor referred to in testimony and the defendant at trial had failed to raise any objection based on Article 21 of the Declaration of Rights, the Court indicated that the hospital record would have been admissible under the business records statute. The Court construed *Johns* as having "held that the right of confrontation does not apply to documentary evidence, and that the Legislature has the constitutional power to change the common law rules of evidence as to what documents are admissible and the

weight to be attributed to them, even in criminal cases."
*Id.* at 533. This sweeping conclusion extended well beyond
the facts with which the Court was faced in *Jones*. Subse-
quent cases have indicated that a more thorough analysis is
required in a confrontation case than the sweeping defer-
ence to legislative alteration of evidence law suggested in
*Jones.*

In 1965, the Supreme Court in *Pointer v. Texas, supra,*
held that the Sixth Amendment right of confrontation is a
fundamental right made obligatory on the states by the
Fourteenth Amendment. In that case, Pointer and a co-de-
fendant were taken before a judge for a preliminary hear-
ing on a charge of robbery. The victim testified at this
hearing, identifying Pointer as the robber; however, neither
of the defendants was represented by counsel. The victim
moved to California and at trial the transcript of his prelimi-
nary hearing testimony was introduced as evidence. Point-
er was convicted and the Supreme Court reversed, holding
that because the testimony was taken at a time when
Pointer was not afforded through counsel an adequate
opportunity to cross-examine the witness, he was denied his
privilege of confrontation.

The Court in *Pointer* cited earlier cases dealing with the
Confrontation Clause to illustrate the Court's under-
standing of this constitutional guarantee. For instance, in
*Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39
L.Ed. 409 (1895), the Court offered one of its earliest
interpretations of the Confrontation Clause:

> The primary object of the constitutional provision in
> question was to prevent depositions or *ex parte* affidavits
> such as were sometimes admitted in civil cases, being
> used against the prisoner in lieu of a personal examina-
> tion and cross-examination of the witness in which the
> accused has an opportunity, not only of testing the recol-
> lection and sifting the conscience of the witness, but of
> compelling him to stand face to face with the jury in
> order that they may look at him, and judge by his
> demeanor upon the stand and the manner in which he

gives his testimony whether he is worthy of belief. There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused. [*Id.* at 242–43, 15 S.Ct. at 339–40.]

Thus, in *Mattox* where the witness had already given testimony under oath and had been cross-examined, his prior recorded testimony was admissible when he was unavailable at a subsequent trial.

On several occasions following *Pointer* the Supreme Court has further defined the confrontation right. In *Douglas v. Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), and *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Court found violations of the defendant's confrontation rights because of an inability to cross-examine an accomplice whose statement incriminating the defendant was presented to the jury. In *Barber v. Page,* 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), the Court recognized that the confrontation requirement is not violated when prior testimony that has been subject to cross-examination is utilized because the witness has become unavailable. However, in that case the Court noted that "a witness is not 'unavailable' for the purposes of the foregoing exception to the confrontation

requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Id.* at 724–25, 88 S.Ct. at 1322. In *Barber,* the Court found that the witness was not "unavailable" because the State made no effort to procure the witness' presence.

In *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), the majority and a concurring opinion addressed the basic relationship between the hearsay rule and the right of confrontation. In that case the chief prosecution witness was present at trial yet became evasive; therefore, he was questioned regarding prior inconsistent statements that inculpated the defendant. California law allowed the substantive use of the statements to prove the truth of the matters asserted therein. The defendant was convicted and the California Supreme Court affirmed a lower court's reversal, reasoning that substantive use of a prior inconsistent statement was precluded by the defendant's Sixth Amendment right to confrontation. The Supreme Court vacated this judgment concluding that this alteration of California's evidence law did not violate the defendant's constitutional rights.

The Supreme Court began its analysis by reviewing the relationship between the Confrontation Clause and the hearsay rule. The Court noted:

> While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See *Barber v. Page,* 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968); *Pointer v. Texas,* 380 U.S. 400 [85 S.Ct. 1065, 13 L.Ed.2d 923] (1965). The converse is equally true: merely be-

cause evidence is admitted in violation of a long-estab-
lished hearsay rule does not lead to the automatic conclu-
sion that confrontation rights have been denied. [*Id.*, 399
U.S. at 155–56, 90 S.Ct. at 1933–34 (footnote omitted).] [1]
The Court reasoned that because the literal right to "con-
front" witnesses formed "the core of the values furthered
by the Confrontation Clause ... there is good reason to
conclude that the Confrontation Clause is not violated by
admitting a declarant's out-of-court statements, as long as
the declarant is testifying as a witness and subject to full
and effective cross-examination." *Id.* at 157–58, 90 S.Ct. at
1934–35. The Court then evaluated the purposes of con-
frontation: (1) to insure that statements are given under
oath; (2) to force the witness to submit to cross-examina-
tion; and (3) to permit the jury to observe the witness'
demeanor. *Id.* at 158, 90 S.Ct. at 1935. Thus, the Court
reasoned that even if an out-of-court statement is admitted,
as a practical matter most of the benefits of these protec-
tions are regained when that declarant is present and testi-
fying at trial. However, Justice Harlan's concurring opin-
ion argued that the Confrontation Clause simply requires
the prosecution to *"produce* any *available* witness whose
declarations it seeks to use in a criminal trial." *Id.* at 174,
90 S.Ct. at 1943 (Harlan, J., concurring). *See generally*
Note, *Confrontation and the Hearsay Rule,* 75 Yale L.J.
1434 (1966); Westen, *The Future of Confrontation,* 77
Mich.L.Rev. 1185 (1979).

In *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d
213 (1970), a plurality opinion, the defendant (Evans) was
convicted of first-degree murder. At trial Shaw, an inmate
of the same institution as Williams (an accomplice to the

---

1. The Court of Special Appeals also has recognized that the Confronta-
tion Clause and hearsay rule are not synonymous. In *Gregory v.
State,* 40 Md.App. 297, 309, 391 A.2d 437 (1978), Judge Wilner engaged
in a thorough analysis of this problem and concluded: "The sugges-
tion that the right of confrontation is no more than a particular
expression or emanation of the hearsay rule does not find substantial
support historically."

murders), testified that when Williams returned from his arraignment he lamented that if it hadn't been for Evans "we wouldn't be in this now." Shaw's testimony was admitted under the Georgia co-conspirator exception to the hearsay rule. The Court of Appeals for the Fifth Circuit reversed the District Court's denial of Evans' petition for writ of habeas corpus, concluding that he had been denied his Sixth Amendment right to confrontation. The Supreme Court reversed, but could not agree on the appropriate rationale.

The plurality opinion reaffirmed the Court's refusal to equate the Confrontation Clause and the hearsay rule. In concluding that admitting the statements did not deprive the defendant of his constitutional right, the plurality focused on two factors. First, it noted that the case did not involve evidence that was "crucial" or "devastating," because there were nineteen other prosecuting witnesses. Second, the plurality noted that the statement was offered to identify Evans and there were sufficient indicia of reliability in connection with the use of this statement in that it was spontaneous and against Williams' penal interest.

Justice Harlan concurred in the result, concluding that due process of law really is the appropriate standard for reviewing state rules of evidence. Harlan explained his departure from the position he took in *California v. Green, supra,* stating that certain types of evidence, notably business records, were so intrinsically reliable that requiring production of the declarant may be difficult, if not pointless.

Two Maryland cases followed *Green* and *Dutton.* In *State v. Collins,* 265 Md. 70, 288 A.2d 163 (1972), this Court concluded that the defendant's right to be confronted by his accusers was violated by admitting an unavailable witness' deposition when the defendant received no notice of, and was not present at, the deposition. Judge Digges observed that traditionally there have been limited exceptions to the right to confront and cross-examine witnesses. "But these aberrations have only been permitted after close scrutiny

has disclosed that this type of *evidence is both necessary and so intrinsically reliable* that it need not be subjected to the rigors of cross-examination." *Id.* at 78, 288 A.2d 163 (footnote omitted) (emphasis supplied).

In *Crawford v. State*, 282 Md. 210, 383 A.2d 1097 (1978), we concluded that the defendant's confrontation right was not violated by using testimony elicited at a preliminary hearing when the witness was unavailable for trial. In that case, the witness' demonstrated unavailability obviously made it necessary for the State to use her prior testimony. Thus, Chief Judge Murphy focused on whether the testimony at the prior judicial proceeding was sufficiently reliable. Citing the test elucidated by the Supreme Court in *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972), that there must be sufficient "indicia of reliability" associated with the former testimony, the Court concluded that the testimony was basically reliable and thus admissible at trial.

*Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), represents the most recent Supreme Court case in this area. Roberts had been arrested and charged with forgery and possession of stolen credit cards belonging to Bernard Isaacs and his wife. At a preliminary hearing, Roberts called the Isaacs' daughter, Anita, and tried to elicit an admission that she, in fact, had given him the checks and credit cards; however, she denied this. At trial, Anita did not appear although the State had issued several subpoenas to her at her parents' residence. Roberts testified that Anita had given him the cards and checks to use, and the State offered the transcript of Anita's testimony on rebuttal. The trial court conducted a *voir dire* hearing after Roberts asserted that use of the transcript violated his rights under the Confrontation Clause. Mrs. Isaacs testified that Anita had left home for Tucson, Arizona, and later was in San Francisco. She had only talked with Anita twice and knew of no way to contact her. The trial court admitted the transcript and the Court of Appeals of Ohio reversed, concluding that the State failed to show that it made a "good-faith effort" to secure Anita's presence. The

Supreme Court of Ohio affirmed on other grounds, nonetheless holding the transcript inadmissible.

The Supreme Court noted that it was "called upon to consider once again the relationship between the Confrontation Clause and the hearsay rule with its many exceptions." *Id.* at 62, 100 S.Ct. at 2537. The Court acknowledged that it had proceeded gradually in this area, but suggested that "a general approach to the problem is discernible." *Id.* at 65, 100 S.Ct. at 2538. The Court stated:

The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases were prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. See *Mancusi v. Stubbs*, 408 U.S. 204 [92 S.Ct. 2308, 33 L.Ed.2d 293] (1972); *Barber v. Page*, 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968). See also *Motes v. United States*, 178 U.S. 458 [20 S.Ct. 993, 44 L.Ed. 1150] (1900); *California v. Green*, 399 U.S., at 161–162, 165, 167, n. 16 [90 S.Ct., at 1936–1937, 1939 n. 16].[7]

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts*, 291 U.S. [97] at 107 [54 S.Ct. 330 at 333].

* * * * * *

The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with

the "substance of the constitutional protection." *Mattox v. United States,* 156 U.S., at 244 [15 S.Ct., at 340].[8] This reflects the truism that "hearsay rules and the Confrontation Clause are generally designed to protect similar values," *California v. Green,* 399 U.S., at 155 [90 S.Ct., at 1933], and "stem from the same roots," *Dutton v. Evans,* 400 U.S. 74, 86 [91 S.Ct. 210, 218, 27 L.Ed.2d 213] (1970). It also responds to the need for certainty in the workaday world of conducting criminal trials.

In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.[9] [*Id.* 448 U.S. at 65–66, 100 S.Ct. at 2538–2539.]

In footnote 7, the Court indicated when "unavailability" might not be required. Citing *Dutton v. Evans, supra,* the Court suggested that if the *utility* of trial confrontation is "so remote" the prosecution would not be required to produce a seemingly available witness.

The Court then applied this analysis to the facts in *Roberts.* The reliability aspect of the test was satisfied because Roberts' attorney effectively cross-examined the witness at the preliminary hearing. Although she was called by the defense, the form of her examination was "replete with leading questions" and was the equivalent of significant cross-examination. Thus, the defense was able to test the reliability of the testimony. Regarding availability, the Court held that the trial court of Ohio correctly concluded that the witness' unavailability had been established.

 These cases make indelibly clear that the essence of the Confrontation Clause is to secure the right of the

defendant to have the witness against him produced in court. An exception is noted when the witness is unavailable and has made an otherwise trustworthy out-of-court statement. In such circumstances, unavailability may be established when the State demonstrates a good-faith effort to produce the witness but to no avail.

The cases also suggest circumstances where the courts have found no confrontation violation because the evidence to be offered is clothed with substantial indicia of reliability. Such evidence is admitted without the declarant's testimony when producing the witness would likely prove unavailing or pointless. Business and hospital records fall within this category and generally the hearsay exception which allows their admission is expressed by statutory enactment.

The Maryland legislature has evidenced its approval of a business records exception to the hearsay rule in Md.Code (1974, 1984 Repl.Vol.) § 10–101, Courts and Judicial Proceedings Article. However, as to the admissibility of records of alcohol test results in prosecutions for crimes growing out of drunk driving, Maryland seems to have made a policy statement and expressed its deep concern with the preservation of a defendant's right of confrontation in prosecutions under the statute. The legislature made clear that alcohol test results are ordinarily reliable and generally admissible as business records. *See* Md.Code (1974, 1984 Repl.Vol.) §§ 10–302 to 10–309, Courts and Judicial Proceedings Article (generally dealing with procuring and using alcohol test results). Section 10–306 governs the admissibility of the test results and provides:

(a) Subject to the provisions of subsection (b), in any criminal trial in which intoxication due to the consumption of alcohol, or being under the influence of alcohol, is an issue, an official copy of the results of a chemical test of breath or blood administered by a person authorized to administer the test, is admissible as substantive evidence without the presence or testimony of the technician who administered the test.

(b) If the State decides to offer the test results without the testimony of the technician, it shall, at least 15 days before trial, notify the defendant or his attorney in writing of its intention and deliver to the defendant or his attorney a copy of the test results to be offered. If the defendant desires the technician to be present and testify at trial, he shall notify the court and the State in writing no later than 5 business days before trial; and if such timely and proper notice is given, the test results are inadmissible without the testimony of the technician. Failure to give timely and proper notice constitutes a waiver of the defendant's right to the presence and testimony of the technician.

It seems to us that § 10–306(b) was designed to subordinate the admissibility of alcohol test results to the timely assertion of the defendant's right of confrontation. The statute requires the tester to be produced, upon the defendant's request, before the evidence may be admitted despite its reliability, and the defendant does not have to proffer what he intends to prove from this witness. In these circumstances, the legislature has safeguarded the defendant's Sixth Amendment right and elevated it over what the statute has declared to be reliable evidence. Moon, of course, contends that the stricture of 10–306(b) pertains to these proceedings since the charges he must answer emanate from drunk driving. However, we held in *State v. Moon*, 291 Md. 463, 436 A.2d 420 (1981), that §§ 10–302 to 10–309 did not specifically apply to these proceedings where blood was taken from Moon as part of his treatment rather than for prosecution under the statute. We do not retreat from that position; nor is it necessary for us to go so far. Suffice it to say that we believe that where the record of alcohol test results, on its face, gives rise to a question as to the reliability of the record and the tester is available and the defendant interposes a seasonable objection, testimony of the declarant is neither frivolous nor pointless. Rather, it is error not to require the declarant to testify before the record is admitted. We believe that this

holding secures to the defendant his right of confrontation and is consistent with the legislative policy which accords alcohol test results less deference than other business records.

Here, the witness was present in the courtroom when Moon objected, pointing to a number of discrepancies on the face of the report which raised a doubt as to its reliability. Moon claimed that the hospital records were silent as to the kind of blood alcohol test performed. Dr. Caplan had indicated that while he was generally familiar with the tests employed at University Hospital, he did not know which specific procedure of the many tests used in the hospital was followed. As a matter of fact, when defense counsel sought to have the Doctor explain how a blood test was performed, the trial court cut off the cross-examination in response to the State's objection. It is obvious to us that, under these circumstances, defense counsel had a sound basis for inquiring what test was used and if the technician was qualified to conduct the test.

Furthermore, the report indicated that it was completed on February 21, and the blood was drawn from the patient on February 18. These facts raise several potentially serious questions counsel may have addressed on cross-examination. Defense counsel in argument had told the trial court that the test was performed on the 21st and the blood drawn on the 18th. He did not know what happened to the blood sample in the interim, that is, how or if it was properly preserved. Cross-examination on whether chemical agents were added to the blood to maintain its stability, if the blood was deposited in a container to avoid evaporation, and if the blood was properly refrigerated to prevent putrefaction was germane to a determination of reliability. *See generally* American Medical Association, Committee on Medicolegal Problems, *Alcohol and the Impaired Driver, A Manual on the Medicolegal Aspects of Chemical Tests for Intoxication* (1968). A most important question was whether the blood test was performed on the 21st as part of Moon's treatment. Moon had been in the hospital three

days, been operated on and placed in casts for his injuries prior to February 21st.' It would be logical for counsel to inquire how blood drawn on the 18th and tested on the 21st had any diagnostic value for treatment already received. If counsel elicited from the technician that the test was conducted on the 21st in response to a police request, the trial judge may have concluded that the test was not performed in connection with Moon's treatment and, therefore, was not pathologically germane to the reason Moon was in the hospital. *See Yellow Cab Co. v. Hicks*, 224 Md. 563, 168 A.2d 501 (1961); *Shirks Motor Express v. Oxenham*, 204 Md. 626, 106 A.2d 46 (1954); *Lee v. Housing Authority of Baltimore*, 203 Md. 453, 101 A.2d 832 (1954); *Globe Indemnity Co. v. Reinhart*, 152 Md. 439, 137 A. 43 (1927). Counsel may even have inquired as to how the test, even if performed on the 18th, was pathologically germane to Moon's treatment if it were not transmitted to the doctors until the 21st. Under these circumstances, the trial court may have been persuaded that the test was inadmissible.

Moon also complained that the report did not bear his name but rather a number. We do not speculate as to what Moon's counsel would seek to prove by cross-examining the witness on this point. We do take note that trial counsel is often resourceful and ingenious in making use of the right of cross-examination. Suffice it to say here that the areas we single out are important enough to indicate that cross-examination would not have been frivolous or pointless.

While we recognize that ordinarily hospital (business) records are regarded as reliable, here, because Moon was denied the right to be confronted with the technician, it is questionable whether the report was properly admitted under the business records statute. Section 10–101(c) of the Courts Article requires that business records be made "at the time they are done or *within a reasonable time afterwards.*" [Emphasis supplied.] No testimony was presented at trial regarding standard hospital procedure and there was no explanation for the three-day delay if it is assumed the test was made on the 18th. Timeliness in

preparing a business record is logically related to the reliability of the record itself. Here, we can make no accurate assessment of the document's reliability because the means of testing its trustworthiness were withheld from the defendant.

■ In short, we conclude that although § 10–306 of the Courts Article has no application to the facts in this case, the policy set forth therein buttresses the conclusion we have reached through constitutional analysis—that Moon's right of confrontation guaranteed by Article 21 of the Maryland Declaration of Rights and the Sixth Amendment to the United States Constitution was denied when the trial court did not require the testimony of the technician before admitting the alcohol test results.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR CARROLL COUNTY AND REMAND TO THAT COURT FOR A NEW TRIAL. CARROLL COUNTY TO PAY THE COSTS.

RODOWSKY, Judge, dissenting.

I respectfully dissent.

The issue is whether admitting Moon's hospital record into evidence, including particularly the results of the blood alcohol test, violated Moon's right "to be confronted with the witnesses against him." U.S. Const. Amendment VI. Here the business records statute was the exclusive basis for evidentiary competency. But the Confrontation Clause does not prohibit a court in a criminal case from receiving into evidence a hospital record reporting the objective results of a scientific test which was ordered for purposes of treatment and which was conducted by a technician who is independent of the police. In my view the conclusion of the majority is not only legally incorrect but, by placing its holding on constitutional grounds, the Court needlessly

brings into question the use in Maryland criminal cases of the most trustworthy exceptions to the hearsay rule.

Moon's file from University Hospital came into evidence as a business record under Md.Code (1974, 1984 Repl.Vol.), § 10–101 of the Courts and Judicial Proceedings Article. The foundation for admission was by a stipulation, the effect of which was as if a mere custodian of the records who had no personal knowledge had testified. Moon's trial counsel, in arguing against admissibility of the laboratory report, at times made statements somewhat inconsistent with his having stipulated a foundation for § 10–101 admissibility. I take it that the majority has concluded that Moon's counsel did stipulate to a sufficient foundation for admitting the exhibit under the statute. Obviously, if the State failed to lay a proper foundation, this case should be resolved under Maryland evidence law and the Court should not address the constitutional issue.

At the constitutional level, the Supreme Court "has not sought to 'map out a theory of the Confrontation Clause that would determine the validity of all ... hearsay "exceptions." ' " *Ohio v. Roberts,* 448 U.S. 56, 64–65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980) (quoting *California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 1937, 26 L.Ed.2d 489 (1970)). *Roberts* is the most recent opinion of the Court on the Confrontation Clause. In footnote 9 to *Roberts, id.* at 66–68, 100 S.Ct. at 2539–2540, the Court reviewed the outpouring of scholarly commentary triggered by "[t]he complexity of reconciling the Confrontation Clause and the hearsay rules" but refused to adopt any one theory as controlling.

*Roberts* does, however, advise that "a general approach to the problem is discernible." *Id.* at 65, 100 S.Ct. at 2538.

The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case ... the prosecution must

either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. [*Id.*]

That statement is immediately qualified by footnote 7 in *Roberts* which in part reads (*id.*):

[7] A demonstration of unavailability, however, is not always required. In *Dutton v. Evans*, 400 U.S. 74 [91 S.Ct. 210, 27 L.Ed.2d 213] (1970), for example, the Court found the utility of trial confrontation so remote that it did not require the prosecution to produce a seemingly available witness.[1]

The Supreme Court in *Roberts* then described the second aspect of confrontation which

operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the fact-finding process by ensuring the defendant an effective means to test adverse evidence, the Clause countenances only hearsay marked with such trustworthiness that "there is no material departure from the reason of the general rule." *Snyder v. Massachusetts*, 291 U.S., at 107, 54 S.Ct. at 333. [*Id.*]

*Roberts* approved the State's placing in evidence during its rebuttal case the transcript of testimony which an unavailable witness had given at a preliminary hearing. The case before us deals with a business record. Nevertheless, *dicta* in *Roberts* answers the Sixth Amendment question presented here.

The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection." *Mattox v. United States*, 156 U.S., at 244 [15 S.Ct. at 340].[8] This reflects the truism that "hearsay rules and the Confronta-

---

1. *Dutton* approved, on its facts, use against the accused of an oral admission made by a coconspirator of the accused to the witness, a fellow prisoner of the coconspirator.

tion Clause are generally designed to protect similar values," *California v. Green*, 399 U.S., at 155 [90 S.Ct. at 1933], and "stem from the same roots," *Dutton v. Evans*, 400 U.S. 74, 86 [91 S.Ct. 210, 218, 27 L.Ed.2d 213] (1970). It also responds to the need for certainty in the workaday world of conducting criminal trials. [*Id.* at 66, 100 S.Ct. at 2539.]

Footnote 8 (omitted from the majority's discussion of *Roberts*) tells us:

[8] *See, e.g., Pointer v. Texas*, 380 U.S., at 407 [85 S.Ct., at 1069] (dying declarations); *Mattox v. United States*, 156 U.S., at 243–244 [15 S.Ct., at 339–340] (same); *Mancusi v. Stubbs*, 408 U.S. 204, 213–216 [92 S.Ct. 2308, 2313–2314, 33 L.Ed.2d 293] (1972) (cross-examined prior-trial testimony); Comment, 30 La.L.Rev. 651, 668 (1970) (*"Properly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions"*). [Emphasis added.]

And *see Dutton v. Evans*, 400 U.S. 74, 95–96, 91 S.Ct. 210, 222–223, 27 L.Ed.2d 213 (1970) (Harlan, J., concurring).

Here the fact which the State seeks to prove by the introduction of the laboratory report is that the ethyl alcohol concentration of Moon's blood sample was 165 milligrams per deciliter. In the language of the hearsay rule the "declarant" is the laboratory technician who performed the test which yielded that measurement. From the standpoint of the first aspect of the Confrontation Clause-hearsay exceptions relationship as discussed in *Roberts*, the declarant is in effect unavailable because it would be pointless for the State to call him as an accuser. Experience teaches us that the technician, even if called to the stand, would have to rely on the hospital's record of the test result in order to testify accurately, or at all. From the trustworthiness standpoint, *Roberts* tells us that the business records exception to the hearsay rule is like a dying declaration, or like cross-examined prior-trial testimony, so that virtually any evidence within the business record exception

comports with the substance of the Confrontation Clause protection.

Likely because these conclusions are so well-established in practice, the United States Supreme Court appears never substantially to have addressed a Confrontation Clause objection to business records evidence. The point was, however, a minor issue in *Heike v. United States,* 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913). That was a prosecution for customs fraud accomplished by the secret insertion of springs into some of the scales used by tax collectors so that imported sugar was underweighed. The Government sought to prove that the actual weights were higher than those recorded by customs agents. To do this the Government offered business records, called "pink books," of other weighings of the same cargoes made by persons called the "city weighers" whose measurements were used by the defendant company to compute how much it was to pay for the sugar. Persons who made the entries in the pink books identified them. Cross-examination revealed that often those persons did not see the reading on the scale but simply wrote down what a city weigher told them. Hearsay! The declarants are the city weighers. In answer to a Confrontation Clause argument the Second Circuit had said simply that "the witnesses whose testimony made the records admissible testified before the jury, and were cross-examined, or opportunity given for cross-examination ...." *Heike v. United States,* 192 F. 83, 97 (2d Cir.1911). On certiorari the Supreme Court, through Justice Holmes, recognized that the city weighers had not been called as witnesses but found no error for the reason, among others, that the pink books had been accepted by the defendant company. 227 U.S. at 145, 33 S.Ct. at 229. In the present case the Sixth Amendment imposes no greater requirement on the State to call the University Hospital laboratory technician than it imposed on the federal government to call the city weighers in *Heike.*

Moon has not referred to, the majority has not cited, and my research has not disclosed any decision holding that the

admission of a hospital record containing an independent observer's report of scientifically objective findings made in the course of treatment violates the Confrontation Clause when the record is admitted through a custodian who is not the declarant. In the following cases courts held that the introduction of hospital records as business records did not offend the Sixth Amendment: *United States ex rel. Henson v. Redman*, 419 F.Supp. 678 (D.Del.1976) (emergency room record noting lacerated vagina and bleeding hymen of rape victim); *United States ex rel. Lurry v. Johnson*, 378 F.Supp. 818 (E.D.Pa.1974), *aff'd*, 510 F.2d 971 (3d Cir.1975) (same; also presence of spermatozoa); *Pickett v. State*, No. 3, Div. 504 (Ala.Crim.App. November 23, 1982), *reh'g denied*, December 28, 1982 (description of vaginal trauma of rape victim); *Henson v. State*, 332 A.2d 773 (Del.Super. 1975) (emergency room record describing injuries of rape victim); *State v. Torres*, 60 Hawaii 271, 589 P.2d 83 (1978) (X-rays of accused showing lodged near the spine an object later identified by expert witness as a .22 caliber bullet); *State v. Simpson*, 625 S.W.2d 957 (Mo.App.1981) (description of rape victim's hysteria and bruises); *State v. Spikes*, 67 Ohio St.2d 405, 423 N.E.2d 1122 (1981), *appeal dismissed sub nom. Spikes v. Ohio*, 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982) (description of victim's injuries in aggravated robbery case); *Hagenkord v. State*, 100 Wis.2d 452, 302 N.W.2d 421 (1981) (finding of sperm in vagina of rape victim and vaginal injuries); *State v. Olson*, 75 Wis.2d 575, 250 N.W.2d 12 (1977) (description of injuries of victim where charge was "endangering safety by conduct regardless of life ....").

There is another class of criminal case in which accused persons have argued that the introduction of business or public records violated the Confrontation Clause. Those cases arise when the record placed in evidence is the report by a scientist employed by the state to determine whether the matter tested is evidence of crime. Frequently the report is introduced through a custodian, or through a supervisor, or pursuant to a statute authorizing authentica-

tion by a certificate. The majority rule in those cases is that there is no Confrontation Clause violation. *See* Imwinkelried, *The Constitutionality of Introducing Evaluative Laboratory Reports Against Criminal Defendants*, 30 Hastings L.J. 621 (1979). The majority taking this no-violation position appears to be substantial. *See, e.g., Kay v. United States*, 255 F.2d 476 (4th Cir.), *cert. denied*, 358 U.S. 825, 79 S.Ct. 42, 3 L.Ed.2d 65 (1958) (blood alcohol report admitted under certificate in drunk driving case); *Montgomery v. Fogg*, 479 F.Supp. 363 (S.D.N.Y.1979) (autopsy report in murder case); *State v. Huggins*, 659 P.2d 613 (Alaska App.1982) (admission under certificate of foundation evidence, such as calibration, for admission of breathalyzer examination results); *State v. Cosgrove*, 181 Conn. 562, 436 A.2d 33 (1980) (state toxicologist's report that substance is marijuana); *Howard v. United States*, 473 A.2d 835 (D.C.1984) (Drug Enforcement Agency chemist's certified report that substance is heroin); *State v. Rhone*, 555 S.W.2d 839 (Mo.1977) (admission through custodian of police laboratory microscopic and spectrographic comparison of fibers in accused's clothing to materials on roof of burglarized building); *State v. Malsbury*, 186 N.J.Super. 91, 451 A.2d 421 (1982) (report from county forensic science laboratory that substance is marijuana); *People v. Porter*, 46 A.D.2d 307, 362 N.Y.S.2d 249 (1974) (blood alcohol test in drunk driving case conducted by private laboratory hired by police; lab notes of chemist, who was deceased at time of trial, identified by coworker); *Burleson v. State*, 585 S.W.2d 711 (Tex.Crim.App.1979) (autopsy admitted in murder case through secretary who transcribed notes of the medical examiner; latter attending professional meeting in California at time of trial); *Robertson v. Commonwealth*, 211 Va. 62, 175 S.E.2d 260 (1970) (attested report by medical examiner that vaginal swabs from victims in rape case contain seminal fluid); *State v. Kreck*, 86 Wash.2d 112, 542 P.2d 782 (1975) (en banc) (report by state chemist in murder case that victim's blood contains chloroform; chemist in Germany).

If the reports in the foregoing cases are sufficiently trustworthy as not to offend the Confrontation Clause, then the laboratory report of the results of an objective test conducted on Moon's blood by an independent technician acting at the request of attending physicians at University Hospital cannot violate the Confrontation Clause.

The minority view in this second class of case is illustrated by *Reardon v. Manson,* 491 F.Supp. 982 (D.Conn.1980), *cause remanded,* 644 F.2d 122 (2d Cir.1981) and by *State v. Henderson,* 554 S.W.2d 117 (Tenn.1977). *Reardon* involved two federal habeas corpus cases. The Second Circuit reversed and remanded both cases for reconsideration under 28 U.S.C. § 2254(d) and *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) in light of the contrary factual findings which had been made in the same cases by the Supreme Court of Connecticut. *See Reardon v. Manson,* 644 F.2d 122 (2d Cir.1981).

*Henderson, supra,* excluded a state toxicologist's report identifying substances to be LSD and marijuana. The Supreme Court of Tennessee distinguished the case before it from a case like that before this Court when it said:

"Yet it must also be noted that the records in this case, while they may satisfy the technical requirements of [the Tennessee business records as evidence statute], do not fit the classic business records mold, *i.e.* 'shop books' or hospital records. Entries in such records are considered reliable because they are made in the course of business and are routinely relied upon by others in carrying on the affairs of the business. In the case of hospital records, medical personnel make life and death decisions as a result of reports and record entries. Such documents are true 'business records,' and their trustworthiness stems from the fact that they are 'prepared for other use and only incidentally found pertinent to litigation.' " [554 S.W.2d at 120 (quoting lower court's opinion).]

Under confrontation principles applied by the United States Supreme Court, and by state and federal courts,

Moon's hospital record was admissible. Nevertheless the majority says that the admission of this particular record as a business record violated Moon's right of confrontation because the record on its face raised possible questions as to its trustworthiness.

Before addressing the majority's analysis some additional background facts should be stated. After the State Police helicopter had flown Moon from the death scene to University Hospital, he was admitted into the shock trauma unit at 2:06 a.m. His injuries included internal abdominal bleeding, a broken left arm, through and through lacerations of the cheek and a head injury. The admitting note describes Moon as "combative, agitated, moving all extremities, verbalizing in incoherent manner." By 2:15 a.m. six "blood gas" tests had been performed. By 2:30 a.m. 14 additional tests had been performed on Moon, including the osmolaliaty test which was indicative of high blood alcohol. By 2:49 a.m. orders had been directed to various laboratories by means of preprinted forms designed to permit the attending physician merely to check the type of test or screening desired. For the patient then identified as "Male Doe 8515," *i.e.*, Moon, the doctors directed such orders to the "microbiology" lab, the "chemistry-24 hour lab," the "hematology II-stat 24 hour lab," the "chemistry automated" lab, the "chemistry-immunoassay" lab and the "toxicology" lab. This latter order resulted in the report on which the issue in this case principally focuses. The report came into evidence as part of State's Ex. 4, the complete University Hospital record on Moon. This one-page report, which includes the blood alcohol result, was also separately marked as State's Ex. 4A.

The parties stipulated that State's Ex. 4 is the original hospital record. There is no question about the authenticity of Exs. 4 or 4A. What the majority really holds is that Ex. 4A is not trustworthy. One reason given is that the "hospital records were silent as to the kind of blood alcohol test performed." Doctor Yale H. Caplan, the chief toxicologist for the State of Maryland in the Medical Examiner's Office,

testified that, while a blood test for alcohol can be done in several ways, "it is basically an objective chemical analysis of blood for a specific substance." From the trustworthiness standpoint it makes no difference which of several "objective" methods was used. The majority says that Moon's counsel "had a sound basis for inquiring . . . if the technician was qualified to conduct the test." It was stipulated that the hospital record was made in the ordinary course of business. In the face of this stipulation the majority says that, unless the technician testifies as to his qualifications and is subject to cross-examination, admitting a University Hospital lab report into evidence as a business record violates constitutional safeguards. This is really holding, out of thin air, that laboratory tests are presumed to be conducted by unqualified technicians in ordinary course at University Hospital, so that the State must explicitly prove the contrary.

The majority emphasizes that Ex. 4A is dated February 21, 1979, while space on that report headed, "Time," is completed "2–18–79 2 $^{49}$ AM." At a pretrial hearing on Moon's motion to suppress the toxicology report, defense counsel informed the court that, based upon counsel's interview with the attending physician, 2 $^{49}$ AM refers to the time when the attending staff took the specimens to be tested. The order to the toxicology lab reflects that the physician initially checked a preprinted block to request a "drug abuse screen," then marked that order "void" and by long-hand requested a "General Drug Screen." State's Ex. 4A, reporting on the "general screen," is a form reflecting that tests were conducted for three types of alcohol and for 15 other substances. The alcohol tests and two others utilized blood while the remaining tests were performed on a urine specimen. All tests other than that for ethyl alcohol were negative. I fail to see how Ex. 4A on its face demonstrates that its admission into evidence is an unconstitutional application of the Maryland business records statute. Because the parties stipulated that Ex. 4, which includes 4A, was prepared in the ordinary course of busi-

ness, for purposes of this appeal the conclusion should be that a general drug screen to test blood and urine for 18 substances can take three days from request to written report. The conclusion should not be that the report is untrustworthy.

Nevertheless, the majority creates a constitutional right out of the possibility that "counsel may have addressed on cross-examination" whether "chemical agents were added to the blood to maintain its stability, if the blood was deposited in a container to avoid evaporation, and if the blood was properly refrigerated to prevent putrefaction." In other words, the risk of University Hospital personnel in the ordinary course of business altering, adulterating or contaminating a specimen preserved for laboratory analysis is considered by the majority to be so great, and the report of the laboratory analysis therefore so untrustworthy, that the ordinary application of the business records statute must be constitutionally restricted. In this respect the majority's rhetoric ignores the appellate record. At the hearing on the suppression motion defense counsel, with the acquiesence of the State, advised the court what the testimony of the attending physician would be were he called to testify.

In conversations with Doctor Millitello, he indicated that the bottom line where it has the time, is when the blood was drawn. But this particular test, this analysis of the blood alcohol, was not done until February the 21st, 1979, and that's ... the reason for that other date that appears on there—apparently, they take a number of samples during the course of the treatment and they're put in the freezer-refrigerator or some such thing. And then when it comes time to do the analyses, they just analyze all of the samples at one time, whether that be for economy or whatever. Doctor Millitello himself wasn't sure as to why it's done that way, but apparently that's the way it is done.... I think that those are the facts. [The State's Attorney] may have some others to add when it comes to his turn.

This representation by defendant's counsel furnished part of the basis for the circuit court's ruling that the toxicology report was admissible. Moon does not attempt to retreat from those representations in his brief to this Court, and indeed would not be permitted to do so. Yet the majority reverses Moon's conviction by speculating that the facts might be contrary to Moon's own representations to the trial court.

· Curiously, another factor which is said to comprise the constitutional violation is that cross-examination might have "elicited from the technician that the test was conducted on the 21st in response to a. police request ...." *State v. Moon*, 291 Md. 463, 436 A.2d 420 (1981) (*Moon* I) arose on the identical appellate record now before us. There we said that the "order from Moon's attending physician for a general drug screening test" and the form of report "effectively refute any suggestion that somehow there was a conspiracy between the State Police and University Hospital ... to obtain the ... blood alcohol content in circumvention of the statute." *Id.* at 466, 436 A.2d at 421.

Next we are told that "[i]t would be logical for counsel to inquire how blood drawn on the 18th and tested on the 21st had any diagnostic value for treatment already received." In this respect the majority presupposes that treatment ceased by February 21 although Moon remained hospitalized until March 6. In my view, the fact that an attending physician, as part of the immediate and total response in the shock trauma unit, ordered a general drug screen makes the report of the test results sufficiently pathologically germane to be beyond constitutional objections.[2] In any event Moon could not conceivably have a right of confrontation to cross-examine the hearsay declarant concerning the medical reasons for ordering the general drug screen. The

---

**2.** Because Moon was incoherent and violent and also had a head injury, the physicians in the shock trauma unit may well have been looking for any help they could get to determine whether Moon's behavior resulted from his injuries or from some other cause, *e.g.*, drugs.

hearsay declarant is the laboratory technician, a Dennis Seabolt, who made a blood alcohol finding and recorded the result. Why the tests were ordered by Doctor Millitello was a medical decision. Ordinarily a laboratory technician is not qualified to give expert testimony concerning the reasons underlying a medical decision.

As I see it, the fundamental error in the majority's rationale is the elevation of speculation above evidentiary fact and common experience. The majority uses the subjunctive mood to present its discussion of the untrustworthiness of Moon's University Hospital record. What Moon's counsel "might" have asked is the sole concern. Under this analysis it is immaterial that the centuries of experience dating from adoption of the shop book rule make it most unlikely that the questions conjured by the majority would produce any answers evidencing a lack of trustworthiness in the hospital record. Thus, the standard for passing constitutional muster moves from the generally accepted reliability of the record to whether defense counsel "might" want to ask some questions. Only such a Kafkaesque standard could convert the admission of reports on which life or death decisions are regularly based into a constitutional violation.

When Moon's new trial is held, and Dennis Seabolt testifies on cross-examination that all he knows is that his report accurately recorded his observations, what will the majority have accomplished?

Judges SMITH and MENCHINE have authorized me to state that they join in the views expressed in this dissenting opinion.